Lawrence Britton LIEBMAN, Appellant,

v.

The STATE of Texas, Appellee.

Norman Dale BLOOMER, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 64684, 64685.

Court of Criminal Appeals of Texas, En Banc.

May 11, 1983.

Rehearing Denied July 20, 1983.

Kim K. Day, Dallas, for appellants.

Henry Wade, Dist. Atty. and Jeffrey Keck, Catherine Crier and Richard Aguire, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Attys., Austin, for the State.

## OPINION

CLINTON, Judge.

Before us are appeals from convictions for public lewdness [1] in which the trial court assessed each appellant's punishment at a fine of $500.00 and 90 days, probated.

As we understand the contentions on appeal, the sufficiency of the evidence to support the convictions is not assailed. However, both appellants contend the incrimina-

---

1. V.T.C.A. Penal Code, § 21.07, provides in pertinent part:

"(a) A person commits an offense if he knowingly engages in any of the following acts in a public place or, if not in a public place, he is reckless about whether another is present who will be offended or alarmed by his act:

\*   \*   \*   \*   \*   \*

(3) an act of sexual contact."

ting evidence introduced against them was obtained as a result of warrantless searches not based on probable cause.

Briefly, that evidence established that on August 3, 1979, in the Paris Adult Theatre, appellant Bloomer entered booth 14 and appellant Liebman entered adjacent booth 15 of the coin operated movie arcade section. This was observed by Dallas Vice Control Division Officers Przywara, Thomas and Sanders.

According to Przywara, what really drew the officers' attention to appellants was that they entered one of the theatre's five adjoining pairs of booths,[2] through which a large hole had been cut at approximately waist high on the common wall. These "glory holes" (socalled in adult book store parlance) were, according to Przywara, commonly used by patrons to engage in sexual conduct with the patron in the neighboring booth.

Having observed the appellants enter the suspected booths and close the respective doors thereto, Pryzwara and Thomas, leaving Sanders in the hall, set out to confirm their suspicions; they entered booth 13 together, closed the door then took turns looking over the seven foot wall at appellant Bloomer. In order to accomplish this, the officers stood on each other's cupped hands. Pryzwara testified that when he looked into adjoining booth 14, he saw Bloomer, with his "body in the approximate location of the glory hole," standing "flushed against the wall with his hands out ... and his waist and entire body appeared to be flushed with the wall. That was the common wall that had the hole in it, facing booth number 15."

Next the officers entered booth 16, again closing the door behind them to exclude intruding eyes. They repeated the sequence of boosting one another in order to effect a view into adjoining booth 15. Pryzwara testified that when he looked into booth 15, he "observed Mr. Liebman ...

seated on a bench with his hands in skin contact with the penis[3] that was stuck through the wall from booth 14 into booth 15 and he was masturbating this penis in a vigorous manner." Considerately waiting for appellants to exit the booths, the officers arrested them at that time.

## I. PUBLIC PLACE?

Appellants contend that the trial court erred in "finding the booths in which [they] were observed were public and thus, that the [searches of them] were legal and reasonable."

■ We first observe that a finding that a place is "public," is not a *sine qua non* of concluding that one has no reasonable expectation of privacy in that place. Conversely, neither is it indispensable to concluding one *has* a reasonable expectation of privacy in a place, that the place is "non-public" or "private." This verity was most succinctly acknowledged by the Supreme Court of the United States in *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967):

> "What a person knowingly exposes to the public, *even in his own home or office,* is not a subject of Fourth Amendment protection. But what he seeks to preserve as private *even in an area accessible to the public,* may be constitutionally protected." [Citations omitted][4]

■ Thus, while the sufficiency of the evidence to establish the offenses alleged here is dependent upon the State's proving appellants committed the culpable acts in a "public place," the public or private nature of the place is by no means determinative of the Fourth Amendment issues presented. E.g., *Cammack v. State,* 641 S.W.2d 906 (Tex.Cr.App.1982); see also *Kirtley v. State,* 585 S.W.2d 724, 725, n. 4 (Tex.Cr.

---

2. The Paris Theatre contained a total of 50 movie arcade booths.

3. "Presumably Bloomer's," as the State's brief observes.

4. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

App.1979); and *Resnick v. State,* 574 S.W.2d 558 (Tex.Cr.App.1978).[5]

█ If appellants' contention can be construed to claim the evidence is insufficient to show booths 14 and 15 of the Paris Theatre were "public places" within the meaning of § 21.07, supra, it is without merit.

V.T.C.A. Penal Code, § 1.07(a)(29) defines "public place" in relevant part: "any place to which the public or a substantial group of the public has *access* and includes ... the common areas of ... shops." We hold the booths in question are what was contemplated by the Legislature to be a "public place." *Cammack,* supra; *Resnick,* supra; *Green v. State,* 566 S.W.2d 578 (Tex.Cr.App.1978). This ground of error is overruled.

## II. REASONABLE EXPECTATION OF PRIVACY?

A determinative issue we confront is whether the officers' conduct in boosting one another to the only vantage points from which appellants could be observed constituted "searches" within the meaning of the Fourth Amendment to the Constitution of the United States.[6] The State correctly observes that this issue depends on whether each appellant can claim a "reasonable" expectation of privacy which has been invaded, and which entitles him to the protection of the Fourth Amendment.

---

**5.** Fourth Amendment claims were not advanced in the cited cases. In *Kirtley,* a citizen was the victim of the sexual contact; in both *Resnick* and *Cammack,* the defendants entered booths in adult bookstores which were *already occupied* by undercover police officers who they proceeded to "grope." Under such circumstances, the reason those appellants did not claim a reasonable expectation to be free from governmental intrusion, is manifest.

Yet a claim that the *place* where the culpable conduct occurred, was not "public" within the meaning of § 21.07, supra, was in each case wholly appropriate.

Thus, to the extent that it has been suggested in other cases that the two issues are inextricably interwoven, or the resolutions to the two issues interdependent, they are disapproved.

## A. SUBJECTIVE EXPECTATION

█ It is well settled by now that this inquiry embraces two discrete questions, the first of which requires a determination of whether the individual has shown that he seeks to preserve something as private; *Katz,* supra; or restated, whether, by his conduct he has exhibited an actual or subjective expectation of privacy. *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

### 1. DESIGN OF THE VIEWING BOOTH

While the design of the "place" in which appellants were observed by the officers is important, see *Green,* supra; *Buchanan v. State,* 471 S.W.2d 401 (Tex.Cr.App.1971), its relevance is in reflecting the inherent opportunity the individual had for privacy in the "place" and the steps he actually took to avail himself of that opportunity.

"But [an] effort to decide whether or not a given 'area,' viewed in the abstract, is 'constitutionally protected' deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. * * * [And what a person] seeks to preserve as private even in an area accessible to the public, may be constitutionally protected."

*Katz v. United States,* supra, 389 U.S. at 351, 88 S.Ct. at 511.

In this case, appellants entered booths constructed of plywood walls and a door, all of which were approximately seven feet

---

**6.** In their motions to suppress both appellants alleged violation of the Fourth Amendment. Only appellant Bloomer claimed suppression is also compelled by Article 38.23, V.A.C.C.P. On appeal, the only State grounds alleged for suppression of the evidence is "Art. 14.01 *et seq.*" V.A.C.C.P., dealing with warrantless *arrests.* But patently, if the officers' conduct constituted "searches" which we determine to be "reasonable," the subsequent warrantless arrests of appellants were authorized by Article 14.01, V.A.C.C.P. (offense committed in officer's presence).

Thus, our disposition of these appeals is predicated only upon the Fourth Amendment to the Federal Constitution since no independent State grounds have been advanced.

high. The design of each of the 50 booths was such that, by placing a quarter in a slot, a movie would be projected onto the inside of the door where there was a projection screen. It was Officer Przywara's testimony that, with the door closed, no one could see "into the booths through a crack in the door." "Most of [the booths] do have locks." [7] The tops of all the booths were open, and "anyone can look over the tops."

## 2. APPELLANTS' CONDUCT EXHIBITING THEIR EXPECTATION

When appellants entered the booths in question, they "closed the door completely," even though, according to Przywara, it is not necessary to completely close the door in order to view the film. The officer testified that unless one were standing on something, or over seven feet tall, he could not see into other booths.

Accordingly, it is clear that a person would have a subjective expectation of privacy under the circumstances and conditions described. As Judge Douglas reasoned for the Court in *Buchanan,* supra, at 404:

"A toilet stall in a public restroom is private to the extent it is offered to the public for private, however transient, individual use. *Britt v. Superior Court,* 58 Cal.2d 469, 24 Cal.Rptr. 849, 374 P.2d 817. The occupants are entitled to the modicum of privacy its design affords. *Brown v. State,* 3 Md.App. 90, 238 A.2d 147.

Similarly, the 3½′ × 4′ booths in the Paris Theatre were offered to the public, including appellants, for private, however transient, use. Appellants apparently took all steps possible to exclude others from the booths.

## B. WAS THIS SUBJECTIVE EXPECTATION JUSTIFIABLE UNDER THE OBJECTIVE CIRCUMSTANCES?

The second question in determining whether a "search" occurred requires an inquiry into whether appellants' subjective expectations of privacy were such that society is prepared to recognize them as "reasonable," or, stated another way, whether appellants' expectations, viewed objectively, were "justifiable" under the circumstances. *Smith v. Maryland,* supra.

Officer Przywara testified that when he entered the booth next to the one occupied by Bloomer he did "definitely not" expect to have privacy from persons who might look at him over the top of the walls; however, he closed the door so *he* would not be observed from the hall:

"[Shutting the door] would keep ourselves from being, what in our terminology is called burned. In other words, our undercover capacity being blown by other individuals who might be walking by in the halls."

Asked why (if persons looking at each other over the seven foot wall were such a common or expected occurrence in the Paris Theatre) he was afraid other patrons would think anything out of the ordinary about seeing him and his partner lifting one another for a view into the adjacent booth, Przywara was constrained to concede patrons would immediately suspect he and his partner were police. He then modified his testimony to the extent that "people could look over the tops. Anyone *can* look over the tops." Thus it appears that the collective consciousness in the theatre was that no one but law enforcement officers *would* look over the booth tops at patrons.

In stark contrast is the situation presented in *Green,* supra. In that case, the appellant was observed through a three to five inch gap between the curtain and the edge of the booth. Green himself testified that in walking down the halls, he had been able to see others in the booths. There the Court, again speaking through Judge Douglas, held:

"A search means, of necessity, a quest for, a looking for, a seeking out of that which offends against the law. This implies a prying into hidden places for that

---

**7.** Officer Przywara testified he did not try the door of the booths after appellants entered them and therefore could not testify to whether or not they were locked.

which is concealed. It is simply not a search to observe that which is open to view." [citations omitted]

566 S.W.2d at 582–583. It was further held that if Green had any subjective expectation of privacy, that expectation was unreasonable under the circumstances.

In *Gillett v. State,* 588 S.W.2d 361 (Tex. Cr.App.1979), the appellant placed a sweater she had taken into a dressing room at Foley's Department Store, into her purse. The merchant had posted a notice on the mirrors of all dressing rooms which stated, among other things: "These fitting rooms are under surveillance by female security." Another sign in the room read, "We prosecute shoplifting." Gillet's attempted theft of the sweater was observed by a female security guard employed by the business establishment which provided the dressing room.

In concluding Gillet had no reasonable expectation of privacy in the dressing room under the circumstances presented, the Court reasoned:

" . . . [T]he posted sign on the mirror . . . was notice that one could not expect privacy. This room was used by the public on conditions *established by the business."*

588 S.W.2d at 363. It is apparent that Foley's, the merchant provider of the stall, being aware of the subjective expectation of privacy harbored by its patrons, sought to modify the collective consciousness in this regard by posting a notice informing them that—in fact—such an expectation was, as an objective matter, unreasonable, since they were subject to surveillance.[8]

In contrast, the evidence adduced in the instant case indicates the management of the Paris Theatre expected their patrons to have privacy in the viewing booths. Officer Przywara testified that sometime between appellants' arrest and trial, steps had been taken with the management's knowledge and consent, to remove the possibility of being viewed from over the top of the booths. Plywood sheets were placed over the tops of the "glory hole" booths. Coke bottles were placed on top "so if anyone moved them, the coke bottles would fall, thereby alerting anyone that someone was trying to move them. * * * [T]hey have since put chicken wire over the tops of the booths that would thwart anyone from looking over them. * * * The chicken wire was strung over all of them but the boards, in the beginning, were only placed over the glory hole booths. And within the past three weeks, there has been plywood that has been placed over only the glory hole booths in the Paris."

From this it may be inferred that it was the intent of the management in providing the viewing booths to preserve the privacy expectations of their patrons;[9] on finding

---

8. While the concerns expressed by the dissenting opinion in *Gillett* regarding "police search[ing] everyone found on the street after 11:00 p.m. after announcing their intention to do" are valid, we emphasize the fact that in *Gillett* it was the *private merchant* which provided the stall for the public to use and which posted the sign and which employed a security guard—*not* the police.

9. The State presents the argument that all the Texas cases on point (save *Green,* supra) turn on the "use to which the viewing booths are intended to be put by the legitimate users." Thus, toilet stalls or dressing rooms are such that *all* persons using them for their intended purpose are "attending to bodily functions or changing clothes [which] will, as a matter of course, be exposing the private parts of their bodies within the enclosures."

But in the present case, the State argues, "the intended purpose of the viewing booth is to provide a darkened area for the viewing of motion pictures.... The intended purpose . . . is to exclude not prying eyes, but light and sound from the outside. When conceptualized in this way, the viewing booth is nothing more than a miniature movie theatre which *is enclosed only for the viewing pleasure* of the theatre's patrons, *and not to insure their privacy."*

We find this argument to be thoughtful and provocative, but in the final analysis, unpersuasive. We are unprepared to take "judicial notice" of the suggested sole "intended purpose" of the booths, particularly, when indications from the evidence are to the contrary.

If this Court is to hazard a guess in this regard, it would be in the more obvious vein that at least some "legitimate users" of these booths would prefer that they not be seen and recognized even entering or exiting an establishment such as the Paris Theatre.

the booths so provided did not effectively preserve that expectation vis-a-vis a determined effort to breach it, the management took additional steps to assure it.

Thus, from all the facts and circumstances it is apparent that appellants' subjective expectations of privacy while in the booths, viewed objectively, were justifiable and those which society would be prepared to recognize as reasonable. In fact, it is clear that this case is controlled directly by *Buchanan,* supra, in which the method of surveillance was the same. There the Court concluded that a law enforcement officer's conduct in looking over the top of an otherwise enclosed restroom stall, which had a door with a lock, constituted a "search."

We are constrained to conclude in this case that the officers' conduct likewise constituted "searches" within the meaning of the Fourth Amendment, and we so hold.

### C. REASONABLENESS OF THE SEARCHES

It is undisputed that the officers had no warrant to conduct the searches of appellants in issue. Thus, our final inquiry seeks to determine the reasonableness of the searches in issue.

### 1. PROBABLE CAUSE

The State contends that the search and subsequent seizure of appellants was based on probable cause, citing testimony of Officer Przywara that the five sets of booths which had "glory holes" were "commonly used for an individual to place his penis through the hole from one booth into another one, whereby, another individual in the adjoining booth would commit a sexual act of masturbation or sodomy by oral copulation on that individual." He stated the booths containing "glory holes" are marked from the outside. The management had placed plywood over the "glory holes," but someone kept removing it. On crossexamination, Przywara admitted he had not arrested everyone he had seen in the booths in question and had seen people in those

booths who were "watching the movie and not violating the law."

The only evidence contained in the record regarding what the officers saw *appellants* do before the search of Bloomer was conducted, was "enter the booths—* * * Mr. Bloomer entered 14 and Mr. Liebman entered 15."

### 2. EXIGENT CIRCUMSTANCES

The State additionally argues "exigent circumstances" justified the intrusions of appellants reasonable expectations of privacy: "while initially developed in the context of automobile searches, the exigent circumstance exception to the warrant requirement has been extended to searches for 'evanescent' evidence and situations involving evidence 'threatened with imminent removal or destruction.'" In sum, the State's argument is tantamount to a "now or never" rationale. Indeed the State contends that "due to the nature" of the crime they suspected was about to be committed, the officers "were aware that their immediate action was required to arrest the appellants and preserve any evidence of the crime."

### 3. THE SEARCH OF BLOOMER

█ Searches that are personal in nature and aimed at discovering evidence of a crime involve a higher degree of invasion of privacy than more "inspection" activities— see *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). In *Camara,* supra, the Court stated:

"Unfortunately, there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails."

387 U.S. at 536–537, 87 S.Ct. at 1735. There is no question that law enforcement agencies have legitimate interests in deterring and punishing sexual conduct committed in a manner which would offend the average citizen who might inadvertently confront it; [10] *viz:* in a public place where

---

**10.** In this case we do not deal with an offense which can be labeled "victimless." See also *Kirtley,* supra, at 725, n. 3.

no one has or is able to exclude others, or in a nonpublic place where an unwitting citizen happens upon the activity due to the actors' reckless disregard for that possibility. Section 21.07(a), supra. But the need for law enforcement agents affirmatively to seek out this conduct under circumstances which do not threaten inadvertent discovery, and thereby knowingly and voluntarily subject themselves to the alarm and offense the statute seeks to contain, seems minimal if not nonexistent. See V.T.C.A. Penal Code, § 1.02(6).

Viewed in this context, the conduct of the officers is revealed to be nothing more than a determined and calculated invasion of privacy which has little relationship to protecting the average law abiding citizen or to advancing the intent of the criminal prohibition involved.

Moreover, these officers had no more probable cause to believe these appellants were "about to commit an offense" simply because they entered adjacent "glory hole" booths than the officers in *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) had to suspect Brown of misconduct justifying his "seizure" because he was in a "high drug traffic" area.

We hold the search of appellant Bloomer was unreasonable and the trial court erred in refusing to suppress all evidence obtained as a result thereof which was introduced against him at trial.

### 4. THE SEARCH OF LIEBMAN

Characteristic of the State's brief in these causes is its final tantalizing contention: [11] "at the point that the officers observed appellant Bloomer in booth 14 with his body flush against the wall adjacent to booth 15 they had probable cause to believe that appellant Liebman was performing oral sodomy or engaging in some sort of sexual contact with the genitals of appellant Bloomer. While the initial observation of

... Bloomer *may* have violated *his* Fourth Amendment rights ... Liebman, occupying booth 15, had no expectation of privacy ... in booth 14. [Emphasis original.]"

As a matter of federal constitutional law, this contention by the State is well taken. Liebman's capacity to claim the protection of the Fourth Amendment in the booth occupied by Bloomer depends upon whether he had a "legitimate" expectation of privacy in Bloomer's invaded booth. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Under all the facts and circumstances presented, we cannot say that he did. *Id.*[12]

Moreover, we agree with the State that all the facts and circumstances within the knowledge of the officers, when coupled with their observation of Bloomer—his body flush against the "glory hole" in the common wall between him and Liebman—gave them probable cause to believe Liebman was engaged in a proscribed sexual act in the adjoining booth. The evanescent nature of the suspected conduct justified the officers' immediate "search" of the booth occupied by Liebman. Cf. *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); and *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

Accordingly, we hold the officers' invasion of Liebman's justifiable expectation of privacy was reasonable within the meaning of the Fourth Amendment.

The judgment of conviction in Cause No. 64,684 is affirmed; the judgment in Cause No. 64,685 is reversed and that cause remanded to the trial court.

ONION, P.J., dissents to Part II C 4.

MILLER, J., dissents to Part I.

---

11. Counsel for the State on appeal is commended for his circumspect assistance to this Court.

12. We again emphasize the fact that State law might well compel a different result; since we are not asked to decide the question on that basis, we do not.