78 P.3d 1159

**STATE of Hawai'i, Plaintiff-Appellee,**

**v.**

**Earl LAWSON,[1] Defendant-Appellant.**

**No. 24665.**

Intermediate Court of Appeals of Hawai'i.

May 21, 2003.

Certiorari Dismissed Nov. 17, 2003.

1. In the record on appeal, Defendant Appellant Earl Lawson (Lawson) is also referred to as "Earl R. Lawson" and "Earl L. Lawson[.]"

Jon N. Ikenaga, Deputy Public Defender, State of Hawai'i, on the briefs, for defendant-appellant.

Bryan K. Sano, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE, and FOLEY, JJ.

Opinion of the Court by WATANABE, J.

Defendant-Appellant Earl Lawson (Lawson) appeals from the October 3, 2001 Judgment of the Circuit Court of the First Circuit, State of Hawai'i (the circuit court),[2] convicting him of Promoting a Dangerous Drug in the Third Degree, in violation of Hawaii Revised Statutes (HRS) § 712-1243 (1993),[3] and Unlawful Use of Drug Paraphernalia, in violation of HRS § 329-43.5(a) (1993).[4]

The Judgment against Lawson was entered pursuant to a Hawai'i Rules of Penal Procedure Rule 11(a)(2)[5] conditional guilty plea, in which Lawson reserved the right to appeal the circuit court's decision[6] denying

2. Judge Dexter D. Del Rosario entered the Judgment.

3. Hawaii Revised Statutes (HRS) § 712-1243 (1993) states, in relevant part:

> **Promoting a dangerous drug in the third degree.** (1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.

4. HRS § 329-43.5(a) (1993) states, in relevant part:

> **Prohibited acts related to drug paraphernalia.** (a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter.

5. Hawai'i Rules of Penal Procedure Rule 11(a)(2) provides as follows:

> **PLEAS. (a) Alternatives.**
>
> . . .
>
> (2) *Conditional Pleas.* With the approval of the court and the consent of the State, a defendant may enter a conditional plea of guilty or *nolo contendere,* reserving in writing the right, on appeal from the judgment, to seek review of the adverse determination of any specified pretrial motion. A defendant who prevails on appeal shall be allowed to withdraw the plea.

6. On July 9, 2001, Judge Russell Blair (Judge Blair) entered "Findings of Fact, Conclusions of Law and Order Denying [Lawson's] Motion to Suppress."

his May 14, 2001 Motion to Suppress Evidence.

Lawson argues, on appeal, that the circuit court erroneously denied his motion to suppress because: (1) the evidence against him was seized with the cooperation of a private citizen who was acting as a government agent, (2) the evidence against him was illegally seized by police officers following a warrantless search of a video booth in which Lawson had a reasonable expectation of privacy, and (3) there were no exigent circumstances to justify the warrantless search and seizure. We disagree and affirm the Judgment.

BACKGROUND

On April 6, 2001, as a result of an incident that occurred on March 24, 2001 at Velvet Video, a store that sold and rented pornographic video cassette tapes (videos) and digital video disks (DVDs), Lawson was charged as follows:

*COUNT I:* On or about the 24th day of March, 2001, in the City and County of Honolulu, State of Hawaii, EARL R. LAWSON, did knowingly possess the dangerous drug methamphetamine, thereby committing the offense of Promoting a Dangerous Drug in the Third Degree, in violation of Section 712–1243 of the Hawaii Revised Statutes.

*COUNT II:* On or about the 24th day of March, 2001, in the City and County of Honolulu, State of Hawai'i, EARL R. LAWSON, did use or possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of Chapter 329 of the Hawaii Revised Statutes, thereby committing the offense of Unlawful Use of Drug Paraphernalia, in violation of Section 329–43.5(a) of the Hawaii Revised Statutes.

On May 14, 2001, Lawson filed a motion to suppress the following items of evidence recovered by the police at Velvet Video that led to his arrest:

1. **GLASS PIPE,** which was seized on the date of 3/24/01, at the time of 0150, from the place of Booth # 7, Velvet Video, 2155 Lau'ula Ave.
2. **CONTENTS OF GLASS PIPE,** which was seized on the date of 3/24/01, at the time of 0150, from the place of Booth # 7, Velvet Video, 2155 Lau'ula Ave.

A hearing on Lawson's motion to suppress was held on June 20, 2001 before Judge Russell Blair (Judge Blair). Two witnesses testified for the State: Daniel Charles Bowen (Bowen), an employee of Velvet Video; and Officer Dason Toma (Officer Toma) of the Honolulu Police Department. A summary of the relevant testimony of the witnesses is as follows:

A. *Bowen's Testimony*

In the early morning of March 24, 2001, Bowen was working the late shift (8:00 p.m. to 4:00 a.m.) at Velvet Video. The store had a front merchandise area, which was separated from a back video booth area by an archway from which light-weight velvet curtains hung. Velvet Video allowed its customers to "preview" videos in half-hour increments in one of eleven private booths in the back of the store. A customer wishing to preview a video would select a video in the merchandise area and bring the empty video box to the attendant. After paying for an increment of time, the customer would be given the video and a remote control and would proceed past the curtains to one of the booths to view the video.

Each booth was square in shape and contained a chair, a rubbish can, a television screen built into the wall, and a video cassette recorder on a built-in shelf above the television screen. The booths could be locked from the inside and contained no light switches. The walls of the booths were about twelve feet high, with a three-foot-high space between the top of the walls and the ceiling. The door to each booth, made of solid plywood, was about seven feet tall and went from the floor to above a person's head. Each booth had a visible sign right below the

television screen that read, "THANK YOU FOR NOT SMOKING[.]"

Six of the eleven booths had a "glory hole" in a common wall that connected two adjacent booths.[7] Each glory hole was approximately four inches in diameter and located about three feet above the floor. It allowed customers in adjacent booths to interact sexually, or otherwise, with each other. The booths did not have any signs identifying which ones had glory holes, but the holes were big enough to be obvious to anyone entering a booth with one.

Sometime between 12:30 and 1:30 a.m. on March 24, 2001, Lawson approached Bowen and asked to preview a video for a half hour in one of the private booths. At the time, there were "a few people walking around" the store, one person playing a pin ball machine, and "two other people in the booths doing previews."

Bowen, who had never seen Lawson before, gave Lawson the video and pointed him towards the booth area. Customers previewing videos were not told to go to or stay in a particular booth but were allowed to "pretty much do whatever they want" in the back area.

Lawson took the video and went into booth No. 7 (booth 7). Meanwhile, Bowen talked with another customer and then went to play a video game that was about "five to seven feet" from booth 7.

While Bowen was playing the video game, he heard the clicking sound of a lighter. He paused to hear where the sound was coming from and determined that it originated in booth 7. Bowen was worried because the store had a "no smoking" policy and he thought Lawson might be "trying to light some papers on fire or something and burn my place down[.]" He also was worried that Lawson might be up to something more serious than smoking a cigarette because Bowen had heard several lighter clicks and "to smoke a cigarette, you have to light your lighter at least once, not five times in a row."

Bowen went to booth No. 8 (booth 8), which was adjacent to booth 7, and peered through the "glory hole" separating the two booths. When Bowen peered through the hole, he saw Lawson with "his left hand resting on his knee and what [Bowen] saw to be a glass pipe in [Lawson's] hand." After getting a little closer and crunching down, Bowen looked through the glory hole again and saw a lighter in Lawson's right hand and a glass pipe in Lawson's left hand. Bowen knew from "experience from years ago" that the pipe was for smoking illegal drugs. As Bowen turned to walk away, he heard the clicking sound again. He looked through the glory hole again and saw that Lawson was "using his lighter to light the pipe with smoke coming from it."

Bowen left the booth and called the police, telling them he thought he had "a person doing illegal drugs, what [he] assume[d] to be illegal drugs, in [his] store." Approximately five to ten minutes later, two police officers arrived.

Bowen described what happened next during the following colloquy at the June 20, 2001 hearing:

> Q. Okay. And when the police arrived, what had happened?
>
> A. [The police] came up the staircase, came into the store, and they said, well, okay, what's going on? I said, well, there's a guy in back there in one of the preview booths doing what I suspect to be an illegal drug. And they said, well, can you show me. So I took them around, and I told them—I said there's a little hole in between the other room and their room. You can look through and obviously see that he's got something in his hands. That he's doing something wrong.
>
> Q. Okay. And the police actually did look through the hole?
>
> A. Yes.
>
> Q. And what happened then?
>
> A. Both officers—well, I don't remember exactly which one was first. They both looked. The one looked first stood up

7. Velvet Video had a total of three "glory holes," each in a common wall connecting two adjacent booths.

and shook his head, and the other one looked around and saw it also.

After that we all three moved into a different section over into the front of the game area. We stood over here. And they said what do you want me to do—what do you want us to do about it? And I said, well, I want him out of here. I said, you know, what can you do? And they had asked, well, how do we get him out of there? I mean they're basically private booths. And I said, well, I have the key. We can open the door, or we can knock or whatever. And basically I went to go get the key, and we went over to the booth.

Q. And you opened the door?

A. And I unlocked the door, yes.

Q. Okay. And at that point, then [Lawson] was arrested?

A. Yes, he was questioned and then arrested, yes.

Bowen also testified that he had never worked with the police prior to that morning and was not working with them that morning.

B. *Officer Toma's Testimony*

In the early morning hours of March 24, 2001, Officer Toma was patrolling Waikīkī when he got a call from dispatch, asking him to go to Velvet Video to investigate a "male possibly smoking a pipe." When Officer Toma arrived at Velvet Video at around 1:00 or 1:30 a.m., he met up with Officer Mark Kutsy (Officer Kutsy)[8] and talked with the clerk in the store to "find out what's going on."

In the following colloquy, Officer Toma described the events leading up to Lawson's arrest:

Q. [Deputy Prosecutor:] Now, when you got there, what did you do?

A. Well, we talked to the clerk to find out what's going on.

Q. The clerk, do you know who the clerk is?

A. I do not know his name.

Q. Okay. That was the first time you had ever met him?

A. Yes.

Q. And when you met with the clerk, what was your understanding of what was going on?

A. That he could hear a male in one of the booths lighting the flint from the cigarette lighter. He could hear that. And he knows the place to be smoke-free so the person there shouldn't be using a lighter. And through his investigation, he recognized the male to have some kind of pipe in his mouth and attempting to light it.

Q. Now, upon learning this, what did you do?

A. We further investigated. We asked him how does he know what the male is doing, and he proceeded to tell us that he could—he related that it was booth number 7 from the flint lighting and he could see inside, and that's what he saw.

Q. Then what did you do after that?

A. We asked him to show us how he saw.

Q. Okay. And did he show you?

A. Yes.

Q. And where was it that he showed you, or how did he show you what he saw?

A. Adjoining to the booth the male was in, there's I guess it's a hole or a peephole and which you could easily see into the booth.

. . . .

Q. So then what did you do after [Bowen] showed you where he had seen it? In other words, he had shown you the booth with the hole?

A. Yes.

Q. Then what happened?

A. After we looked, then I informed [Officer Kutsy] and then he proceeded to look also.

Q. Okay. When you say "look," what did you see when you looked?

A. I seen [Lawson] sitting in that black chair same as the photo, and he had the pipe in one hand and the lighter. You know that he's attempting to light it.

8. Officer Mark Kutsy is referred to as "Officer Cutsey" in the transcript.

Q. Okay. And how—did you notice anything else about [Lawson]?

A. His pants was down around his thigh area.

Q. And when you had to look through this hole, did you notice anything covering the hole?

A. No.

Q. You had—basically it was a clear view?

A. Yes.

Q. And then what happened?

A. After I informed [Officer Kutsy] and he looked, then we talked to the clerk attendant again; and we asked him what did he want us to do pretty much.

Q. And then what happened?

A. Well, I assumed the door was locked because just by looking at the knob, it appeared that you needed a key to enter. And he proceeded to get the key and open it for us.

Q. And then what happened?

A. Then—well, [Lawson] came out. [Officer Kutsy] went into the booth first, or he escorted him out and then recovered the pipe from the trash can.

Q. Okay. But I thought you said it was in his hand?

A. Yeah. This is when he was sitting in the booth, and he didn't know we were outside. So when he—I guess when he realized we were there, he decided to disregard the pipe.

Q. All right. Prior to entering the booth, officer, did either you or [Officer Kutsy] announce your presence?

A. No.

Q. And why is that?

A. Because it's a glass pipe, it's easily broken or easy to demolish so he could have easy just broke it; and that would have destroyed the evidence that we needed.

Q. Okay. Did you ever—you said this was the first time you met with [Bowen], right?

A. Yes.

Q. So [Bowen] was not working on behalf of the police department.

A. No.

. . . .

Q. [Defense Attorney:] When you guys looked [into the hole], you didn't alert [Lawson] to your guys' presence on the outside, right?

A. No, sir.

Q. You guys went and had [Bowen] get the key, right?

A. [Bowen] did that on his own.

Q. [Bowen] did it on his own.

A. Yes.

Q. And [Bowen] opened the door?

A. Yes.

Q. And you guys was standing right there looking at [Lawson], right?

A. Yes.

On July 9, 2001, Judge Blair entered "Findings of Fact, Conclusions of Law and Order Denying [Lawson's] Motion to Suppress." On July 30, 2001, Judge Blair signed an "Amended Findings of Fact and Conclusions of Law and Order Denying [Lawson's] Motion to Suppress,"[9] finding and concluding, in relevant part, as follows:

*FINDINGS OF FACT*

1. Velvet Video is located at 2155 Lau'ula Avenue, Honolulu, Hawaii 96815. Velvet Video is a retail store open to any member of the public and sells and rents pornographic videotapes and [DVDs]. Velvet Video is a smoke free and drug free workplace, with signs indicating as such. Velvet Video has an area where merchandise and inventory are displayed and a separate area where 11 video booths are

9. The "Amended Findings of Fact and Conclusions of Law and Order Denying [Lawson's] Motion to Suppress" (the Amended Order) do not appear to have been officially filed as part of the record below. However, a copy of the Amended Order, originally signed by Judge Blair, is attached as Exhibit B to the written conditional guilty plea signed by Lawson, pursuant to which Lawson reserved the right to appeal the Amended Order. Furthermore, both parties have referred to the Amended Order in their briefs as containing the relevant findings of fact and conclusions of law being challenged by Lawson on appeal.

available for customers to view the videotapes. All rooms have a door that can be locked if so desired. Rooms that are not in use are left open for anyone to enter. A curtained walkway separates the viewing booths from the merchandise/inventory area of the store.

2. Customers are charged a fee of $3.00 to view a videotape and are allowed to either borrow the videotape for viewing off premise or view the videotape in any one of the eleven "viewing" rooms.

3. On March 24th, 2001, [Lawson] paid the $3.00 fee to [Bowen], an employee of Velvet Video, after which he went to "viewing" booth seven. [Lawson] entered booth seven and locked the door. There was a common wall between booth seven and booth eight. There was also an opening about three to four feet from the ground and approximately four inches in diameter. The opening neither was covered nor meant to be covered. The hole was very evident to anyone entering booth seven and is commonly known in the pornographic video rental business as a "glory hole." The "glory hole" is designed to allow individuals in adjacent booths to interact sexually with one another, as well as to permit voyeurism, exhibitionism and fellatio.

4. Additionally, booth seven had a sign placed prominently by the videotape viewing screen that noted, "Thank you for not smoking", (capitals in original omitted). Booth seven shares a "glory hole" with booth eight that was unoccupied during the time [Lawson] was in booth seven and the door to booth eight was open. There were two other patrons of Velvet Video at the time.

5. While [Lawson] viewed his videotape, [Bowen] was approximately seven to ten feet away from booth seven, playing one of the video game machines. [Bowen], a cigarette smoker, heard a sound that he recognized to be the clicking of a lighter coming from booth seven.

6. [Bowen] believed the no smoking policy of the store was being violated by the individual in booth seven and went to booth eight and looked through the "glory hole". [Bowen] saw clearly [Lawson] holding a glass pipe. A few moments later, after hearing the cigarette lighter used again, [Bowen] looked through the glory hole and saw [Lawson] lighting the contents of the glass pipe.

7. Based upon his past experience, [Bowen] recognized the glass pipe as drug paraphernalia and telephoned "911" and reported the illegal drug use.

8. As a result of [Bowen's] call, police dispatch sent Officers Toma and Kutsy to Velvet Video to investigate the report of a "male possibly smoking the pipe." The officers understood this to be a reference to drug paraphernalia and illegal drugs. The officers arrived at Velvet Video within minutes.

9. Upon their arrival at Velvet Video, Officers Toma and Kutsy were met by [Bowen], who informed them of the activity he saw [Lawson] engaging within booth seven. Specifically, [Bowen] explained that he saw [Lawson] in booth seven "doing what [Bowen] believe[d] to be illegal drugs" and mentioned seeing a "glass pipe." [Bowen] further explained that he had seen [Lawson] through the opening in booth eight.

10. [Bowen] took the officers to booth eight and showed them the "glory hole" through which he observed [Lawson] using the glass pipe.

11. [Lawson] was still in booth seven and Officer Toma could plainly see him with the glass pipe in his hand and a lighter in his other hand. Officer Toma also noticed that [Lawson's] pants were down to his thighs.

12. [Lawson] never made any attempt either to block or cover the "glory hole".

13. After observing [Lawson] smoking the glass pipe, the police asked [Bowen] what he wanted them to do. [Bowen] responded "I want him out of here." The police asked [Bowen] "how do we ge [sic] him out?" [Bowen] replied "I have a key, or we can knock." [Bowen] got the key and opened the door to booth seven, after which [Lawson] stood up and threw the glass pipe into the wastebasket.

14. The police officers recovered the glass pipe from the wastebasket, which

was empty but for the pipe and arrested [Lawson].

15. The court finds the testimony of [Bowen] and Officer Toma to be credible and reflects accurately the incident.

*CONCLUSIONS OF LAW*

1. The court has jurisdiction over the present matter.

2. The Fourth Amendment to the United States Constitution and article I, section 7 of the Hawaii State Constitution protect individuals from unreasonable intrusions by the government, but not against those of civilians. *State v. Boynton,* 58 Haw. 530, 574 P.2d [1330] (1978). Suppression of evidence acquired during an illegal search is a measure intended to curb potential excesses by law enforcement agencies; suppression rules do not apply to searches conducted by civilians. *People v. Esposito,* [37 N.Y.2d 156, 371 N.Y.S.2d 681] 332 N.E.2d 863 (1975).

3. In addition, in order to assert legal standing under traditional exclusionary rule analysis, an individual's personal rights must have been violated. *State v. Araki,* 82 Hawai'i 474, 923 P.2d 891 (Sup. 1996) (citing *State v. Narvaez,* 68 Haw. 569, 722 P.2d 1036 (1986)).

4. An individual who seeks the suppression of evidence based upon an illegal search and seizure has the burden of establishing not only that the evidence was unlawfully acquired, but also that his own constitutional rights were violated by the search and seizure.

5. An individual's ability to invoke the constitutional protections against unreasonable search and seizure depends upon whether he had a legitimate expectation of privacy in the particular area. *Katz v. United States,* 389 U.S. 347, 360-61 [88 S.Ct. 507, 19 L.Ed.2d 576] (1967); *State v. Abordo,* 61 Haw. 117, 122, 596 P.2d at 776 (1979).

6. [Bowen] was only a civilian and not an employee of a government agency or an agent for the government. [Bowen] was only concerned that the no smoking store policy was being violated and thus, he entered booth eight and observed [Lawson] with the glass pipe and lighter in his hand.

7. [Bowen's] observation does not raise any issues under the Fourth Amendment of the United States Constitution or article I, section 7 of the Hawaii State Constitution. The information [Bowen] related to the police was inherently credible, as he had no motive to manufacture a charge against a customer and any prevarication would have been quickly discovered by the officers.

8. Officers Toma and Kutsy were summoned to Velvet Video as a result of the complaint made by [Bowen] of illegal drug activity occurring at Velvet Video. Based upon the first hand observation of [Bowen] and as reported by him, Officer Toma had probable cause to believe [Lawson] was engaged in criminal activity prior to observing [Lawson]. Thereafter, from booth eight, a non-intrusive vantage point accessible to any person in booth eight, Officer Toma observed [Lawson] engaged in the illegal drug activity as reported as reported [sic] also by [Bowen].

9. In the instant matter, [Lawson] neither exhibited an actual expectation of privacy nor would society find his smoking the glass pipe in booth seven with the opening through which he could easily be seen from booth eight and that he did not attempt to cover to constitute an objectively reasonable manifestation of an expectation of privacy. *State v. Meyer[ ],* 78 Hawai'i 308, 893 P.2d 159, 164 (Sup.1995); *see also, State v. Texeira,* 62 Haw. 44 [609 P.2d 131] (1980); *State v. Bonnell,* 75 Haw. 124 [856 P.2d 1265] (1993).

10. Additionally, there were exigent circumstances that justified the immediate arrest of [Lawson] and recovery of the glass pipe without a warrant: Officer Toma lawfully observed [Lawson] in the act of ingesting an illegal drug and any delay would allow, more, if not all, of the drug to be consumed.

11. Based upon the above, the lighter, glass pipe and the contents therein, were lawfully recovered by the police.

On July 30, 2001, Lawson entered a conditional guilty plea. Lawson reserved the

right "to seek appellate review of the denial of [his] Motion To Suppress Evidence filed May 14, 2001, and denied by amended order dated 7/30/01."

On October 3, 2001, a Judgment was filed, pursuant to which Lawson was sentenced to a term of five years' imprisonment on each count, to be served concurrently with a mandatory minimum of thirty days' imprisonment for the Promoting a Dangerous Drug in the Third Degree charge. This timely appeal followed on November 2, 2001.

## STANDARD OF REVIEW

A circuit court's findings of fact and conclusions of law in a pre-trial ruling are reviewed according to the following standard:

> Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. The circuit court's conclusions of law are reviewed under the right/wrong standard. Furthermore, in a case such as the one at bar, the proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his or her own Fourth Amendment rights were violated by the search and seizure sought to be challenged. The proponent of the motion to suppress must satisfy this burden of proof by a preponderance of the evidence.

*State v. Anderson,* 84 Hawai'i 462, 467, 935 P.2d 1007, 1012 (1997) (brackets, citations, emphasis, and internal block quote formatting and quotation marks omitted).

## DISCUSSION

### A. *Bowen Was Not Acting as a Government Agent*

It is well settled that the purpose of the fourth amendment to the United States Constitution[10] and article I, section 7 of the Hawai'i State Constitution[11] is "to protect individuals against intrusions by the *government.*" *State v. Kahoonei,* 83 Hawai'i 124, 129, 925 P.2d 294, 299 (1996) (emphasis in original). Evidence obtained by a private individual acting wholly on his or her own initiative is therefore properly admissible in a criminal trial. *Id.*

Lawson contends that Bowen's actions in this case constituted government action and, therefore, the seizure of the evidence obtained by police with Bowen's participation was unlawful. We disagree.

In *Kahoonei,* the Hawai'i Supreme Court held that there is no bright-line rule for determining whether a private individual is acting as a government agent. *Id.* at 130, 925 P.2d at 300. Rather, the totality of the circumstances must be examined

> to determine whether the governmental involvement is significant or extensive enough to objectively render an otherwise private individual a mere arm, tool, or instrumentality of the state. In so doing, we focus on the actions of the government, because ... the subjective motivation of a private individual is irrelevant.

*Id.* The supreme court stated that under the totality of the circumstances test, several factors may be considered in determining

10. The fourth amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

11. Article I, section 7 of the Hawai'i State Constitution states:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

whether a private individual was acting as a police agent:

> whether the private individual: (1) was actively recruited; (2) was directed by a government agent; (3) acted for a private purpose; and (4) received any payment for his or her services.

*Id.* at 127, 925 P.2d at 297 (referring to *State v. Boynton,* 58 Haw. 530, 537–38, 574 P.2d 1330, 1335 (1978)). However, the supreme court emphasized that a private individual's subjective reasons or motivation for participating in a search and seizure are irrelevant to the analysis. *Kahoonei,* 83 Hawai'i at 131, 925 P.2d at 301.

■ Applying the totality-of-circumstances test to the facts in this case, we conclude that the circuit court correctly determined that Bowen was not acting as a "government agent" in this case. According to the substantial evidence in the record, Bowen was not actively recruited, directed, or paid by the police. Additionally, Bowen's actions were for a private purpose—to make sure Lawson was complying with Velvet Video's no-smoking policy and not doing anything that would harm the store.

### B. *Whether Lawson Had a Reasonable Expectation of Privacy in the Video Preview Room*

Under the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i State Constitution, people are protected "from unreasonable government intrusions into their legitimate expectations of privacy." *State v. Bonnell,* 75 Haw. 124, 136, 856 P.2d 1265, 1272 (1993). The basic purpose of these constitutional provisions "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Id.* (internal quotation mark omitted).

In this regard, the supreme court has stated:

> It is well settled that an area in which an individual has a reasonable expectation of privacy is protected by the fourth amendment of the United States Constitution and by article [I], § 7 of the Hawaii State Constitution and cannot be searched without a warrant.
>
> Any warrantless search of a constitutionally protected area is therefore presumptively unreasonable unless there is both probable cause and a legally recognized exception to the warrant requirement.

*State v. Biggar,* 68 Haw. 404, 407, 716 P.2d 493, 495 (1986) (citations omitted).

A two-part test has been adopted by the Hawai'i Supreme Court for determining whether an individual has a reasonable expectation of privacy in a particular area:

> First, [the individual] must exhibit an actual, subjective expectation of privacy. Second, that expectation must be one that society would recognize as objectively reasonable.

*State v. Bonnell,* 75 Haw. at 139, 856 P.2d at 1274 (internal quotation marks omitted). Additionally, the supreme court has stated:

> If an object or an activity is open and visible to members of the public, no reasonable expectation of privacy can be asserted and a governmental observation of that activity will not constitute a search and seizure in a constitutional sense.
>
> A search implies a prying into hidden places for that which is concealed and it is not a search to observe that which is open to view.

*State v. Kaaheena,* 59 Haw. 23, 28, 575 P.2d 462, 466 (1978) (citations and internal quotation marks omitted).

In *Kaaheena,* the Hawai'i Supreme Court held that a defendant's constitutional rights were violated when the defendant's gambling activities were observed by a police officer "standing on a crate stacked upon a bench and peering [into a building] through a one-inch aperture in the window caused by a hole in the closed venetian blinds and a sag in the drawn drapes[.]" *Id.* at 25, 575 P.2d at 464. The *Kaaheena* court noted that

> [a] completely different situation with a different result would be presented if the aperture were at the eye level of one merely standing on the sidewalk instead of being high off the ground. In such a case, it would not have been objectively reasonable to entertain an expectation of privacy.

Any member of the curious public could, without any assistance, glance into the building. But when the placing of a crate on top of a bench is necessary to give one an elevated vantage point from which to view the alleged illicit activities, the artificial creation of that vantage point will not convert to open view what was reasonably expected to have been private.

*Id.* at 29–30, 575 P.2d at 467.

In *Biggar*, the supreme court was called upon to determine whether a defendant had a reasonable expectation of privacy inside a closed toilet stall at a public airport. The defendant in *Biggar*, upon his arrival in Hawai'i, had been detained for investigation by a police officer. After informing the officer that he needed to use the bathroom, the defendant was taken by the officer to a bathroom and instructed not to flush the toilet. The defendant then went into a toilet stall and shut the door. Because the door did not shut completely, the officer was able to peek through a one-half- to one-inch crack and observe that the defendant was not using the toilet. Suspecting that the defendant was trying to destroy evidence, the officer went into the adjacent stall, climbed on the toilet seat, peered over the partition, and witnessed the defendant withdrawing his hand from the disposable seat cover dispenser. After the defendant left the stall, the officer reached into the dispenser, pulled out a packet of cocaine, and arrested the defendant.

On the defendant's appeal from a first-degree promotion-of-dangerous-drug conviction, the supreme court concluded that the defendant had a reasonable expectation of privacy in the bathroom, which was violated when the police officer stood on an adjacent toilet and peered over the partition:[12]

Applying the second prong of the [two-part] test first, we think it is beyond dispute that an expectation of privacy in a closed toilet stall is one that society would recognize as objectively reasonable.

We also think that [the defendant] exhibited a subjective expectation of privacy by closing the stall door. That the door did not close completely did not eliminate this expectation, since the crack was too small to afford [the police officer] more than an occasional glimpse of [the defendant's] shoulder.

*Id.* at 407, 716 P.2d at 495 (citation omitted).

The *Biggar* court specifically declined to address the allegation of the defendant that his expectation of privacy had been violated when the police officer peered through the crack in the bathroom door. *Id.* at 406 n. 4, 716 P.2d at 495 n. 4. The supreme court noted, however, that

in *State v. Kaaheena*, 59 Haw. 23, 575 P.2d 462 (1978), where we invalidated a search based upon the observations of an officer who had to stand on crates to look through a hole in a venetian blind, *we suggested that the result might be different if the hole had been at ground level.*

*Id.* (emphasis added).

In this case, Lawson contends that he exhibited a subjective expectation of privacy when he "specifically chose to conduct his actions in a private, closed, locked video booth in a private business that dealt exclusively in pornographic materials, not in a public park or on the street." According to Lawson, the nature of his activities "concerned matters that are inherently private" and "it is reasonable to infer that an individual who chooses to watch pornography with his pants down around his thighs while attempting to use drugs has a subjective expectation of privacy in such actions." Lawson also argues that his subjective expectation of privacy was one that society would recognize as objectively reasonable.

Based on our review of the record, we disagree that Lawson could have reasonably expected privacy against being observed while in booth 7. Even in the analogous situation where a defendant has been held to

12. Other courts have similarly held that an individual has a legitimate expectation of privacy when he or she enters an enclosed toilet stall in a public restroom and closes the door to the stall. *See, e.g., Kroehler v. Scott*, 391 F.Supp. 1114 (E.D.Penn. 1975); *Brown v. State*, 3 Md.App. 90, 238 A.2d 147 (1968); *People v. Kalchik*, 160 Mich.App. 40, 407 N.W.2d 627 (1987); *People v. Abate*, 105 Mich.App. 274, 306 N.W.2d 476 (1981); *State v. Bryant*, 287 Minn. 205, 177 N.W.2d 800 (1970); *Buchanan v. State*, 471 S.W.2d 401 (Tex.Crim.App.1971).

have a reasonable expectation of privacy in a public bathroom stall, courts have concluded that the defendant only has the right to reasonably expect to enjoy such privacy as the design of the stall afforded. In *People v. Kalchik,* 160 Mich.App. 40, 407 N.W.2d 627, 631 (1987), for example, the Michigan Court of Appeals stated:

> [A] bathroom stall ... does not afford complete privacy, but an occupant of the stall would reasonably expect to enjoy such privacy as the design of the stall afforded, i.e., to the extent that defendant's activities were performed beneath a partition and could be viewed by one using the common area of the restroom, the defendant had no subjective expectation of privacy, and, even if he did, it would not be an expectation which society would recognize as reasonable. On the other hand, defendant did have an actual, subjective expectation that he would not be viewed from overhead.

*See also United States v. Billings,* 858 F.2d 617 (10th Cir.1988) (defendant using public restroom at airport had no reasonable objective expectation of privacy in the gap area between the bathroom stall and the floor that was observable by the ordinary restroom patron and, thus, a police officer's plain observation of contraband (a clear bag with a white substance) taped to defendant's leg did not violate defendant's right of privacy and did not taint subsequent search of defendant); *State v. Cooper,* 29 Kan.App.2d 177, 181, 23 P.3d 163, 166 (2001) ("Bathroom stalls do not provide complete privacy, 'but an occupant of the stall would reasonably expect to enjoy such privacy as the design of the stall afforded.' ").

In this case, the evidence indicated that Velvet Video was a commercial establishment open to the public. Any member of the general public could have walked into booth 8 and observed Lawson, without assistance, through the glory hole. The glory hole was at waist level, clearly visible to the naked eye, four inches in diameter, and its function was to allow interaction between occupants of the adjoining booths for purposes of mutual viewing of each other and/or sexual activities between them.

Since Lawson took no steps to cover up the glory hole, he could not have reasonably expected that his conduct would not be viewed through the glory hole. Consequently, Lawson could not have had a subjective expectation of privacy in booth 7 that society would recognize as objectively reasonable. *In accord Ross v. Springfield School Dist. No. 19,* 71 Or.App. 111, 115, 691 P.2d 509, 512 (1984) (upholding the termination of a teacher for "immorality," based on the teacher's conduct of engaging in sexual intercourse with another man in an adult bookstore movie arcade booth that had a "four inch diameter 'glory hole' at waist height in a wall connecting the booth to another booth" and through which the teacher could have been observed by a person in the other booth, the court stated that the defendant "was not accidentally observed in a place where he had a right to believe that he was safe from observation; rather, he voluntarily took the risk of being observed in a place where he either knew or should have known that he could not expect complete privacy.").

### C. *Whether the Officers Conducted an Illegal Warrantless Search and Seizure*

"When a governmental intrusion does not invade an individual's legitimate expectation of privacy, there is no search subject to the Warrant Clause." *State v. Meyer,* 78 Hawai'i 308, 312, 893 P.2d 159, 163 (1995) (quoting *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983)) (internal quotation marks omitted). In *Meyer,* the Hawai'i Supreme Court explained that

> [a] search implies that there is an exploration for an item or that the item is hidden. However, neither factor is present in open view or plain view observations, and neither observation involves a search in the constitutional sense. In other words, neither open view nor plain view observations involve an invasion of an individual's reasonable expectation of privacy.

*Id.* at 312, 893 P.2d at 163 (citations and internal quotation marks omitted). The supreme court distinguished between open-

view and plain-view observations, in part, as follows:

> In the plain view situation, the view takes place *after* an intrusion into activities or areas as to which there is a reasonable expectation of privacy. The officer has already intruded, and, if his or her intrusion is justified, the objects in plain view, sighted inadvertently, will be admissible.
>
> In the open view situation, however, the observation takes place from a non-intrusive vantage point. The governmental agent is either on the outside looking outside or on the outside looking inside at that which is knowingly exposed to the public. The object under observation is not within the scope of the constitution.

*Id.* at 312–13, 893 P.2d at 163–64 (quoting *Kaaheena,* 59 Haw. at 28, 575 P.2d at 466) (brackets, citations, and internal formatting omitted; emphasis in original). Elaborating further on the open-view situation, the supreme court said:

> *[I]n an open view sighting, a police officer observes something illicit from a public vantage point. There is no intrusion present because, in theory, the object or activity is something any member of the public could themselves observe.* In *Bonnell,* this court noted that
>
> > we have held that, where the object observed by the police is in open view, it is not subject to any reasonable expectation of privacy, and the observation is not within the scope of the constitution. In the open view situation, the observation takes place from a non-intrusive vantage point. The governmental agent is either on the outside looking outside or on the outside looking inside at that which is knowingly exposed to the public.
>
> *Bonnell,* 75 Haw. at 144, 856 P.2d at 1276 (internal quotation marks and citations omitted).
>
> *In legitimate open view sightings, the warrantless seizure of the evidence in question depends on whether the item is in a constitutionally protected area.* If the evidence is not in an area where there is a reasonable expectation of privacy, that is, if it is located in a common space, such evidence is subject to seizure by the governmental agent who spots it, without the necessity of a warrant or exigent circumstances. "If a police officer sees probable evidence in open view in a constitutionally non-protected area, he or she may, of course, seize it. He or she seizes it because there is no constitutional provision to gainsay the seizure." *State v. Hook,* 60 Haw. 197, 201, 587 P.2d 1224, 1228 (1978) (citation omitted).
>
> *However, if the evidence in question is in open view in an area in which the evidence retains its constitutional protection, a warrant is required or exigent circumstances must exist before the object may be seized.* "Visibility of contraband within constitutionally protected premises is not enough to justify entry and seizure without a warrant." *Id.* at 202, 587 P.2d at 1228. In attempting to define "exigent circumstances," this court in [*State v.*] *Clark* [, 65 Haw. 488, 654 P.2d 355 (1982) ] stated:
>
> > [A]lthough the term "exigent circumstances" is incapable of precise definition, generally speaking it may be said to exist when the demands of the occasion reasonably call for an immediate police response. More specifically, it includes situations presenting an immediate danger to life or of serious injury or an immediate threatened removal or destruction of evidence. However, the burden, of course, is upon the government to prove the justification.
>
> [*Id.*] at 494, 654 P.2d at 360 (internal citations and brackets omitted).
>
> In [*State v.*] *Kapoi* [, 64 Haw. 130, 637 P.2d 1105 (1981) ], following a valid arrest and after the booking process, the police returned to the scene of the arrest where the defendant's vehicle was parked. The police had received a call while at the station that, prior to the defendant's arrest, he had been carrying a handgun. Because of the darkness of the early morning hour, the officer surveyed the interior of the vehicle with the aid of a flashlight through the vehicle's window. The officer observed the butt of a handgun protruding from a holster that was on the floor of the

vehicle. The officer returned to the station, retrieved the keys for the defendant's vehicle, and, upon returning to the scene, opened the locked door and seized the handgun.

Acknowledging the distinction between open view and plain view, the *Kapoi* court determined that the handgun was in open view because the officer was "on the outside looking inside at that which was knowingly exposed to the public." [*Id.*] at 140, 637 P.2d at 1113 (citation omitted). The court stated:

> Hence, his observation of the weapon was not subject to constitutional considerations. Furthermore, the fact that the visual inspection was aided by a flashlight did not convert the scan of the vehicle's interior into a constitutionally regulated "search."
>
> But even the "open view" of possible contraband, without more, furnished no basis for its seizure without a warrant. For "no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'" Thus, we are compelled to examine the circumstances in which the officer found himself to determine whether the exigencies of the moment were such as to sustain his decision to seize the gun without a judge's concurrence.

*Id.* at 140–43, 637 P.2d at 1113–14 (internal citations and footnotes omitted). In concluding that the seizure of the handgun did not breach constitutional guarantees against unreasonable searches and seizures, the court described the circumstances that it believed demonstrated the exigency of the situation:

> The car was exposed to public view; there was a foreseeable risk that the evidence it sheltered might be removed before a warrant could be sought some hours later. Moreover, the object in question was a firearm likely to draw the attention of possible intruders in a neighborhood considered a "trouble spot" by the police. [T]he threat to public safety engendered by the situation also causes us to consider the officer's actions reasonable.

*Id.* at 143, 637 P.2d at 1115 (citation omitted).

*Meyer,* 78 Hawai'i at 313–14, 893 P.2d at 164–65 (internal brackets and ellipses omitted; emphases added).

We have already concluded that Lawson's reasonable expectation of privacy was not invaded when the police officers observed Lawson's conduct through the obvious glory hole between booths 7 and 8. It follows that the glass pipe and its contents were in "open view" and the police officers' observation through the glory hole of Lawson smoking what appeared to be an illegal substance in a glass pipe did not constitute a search that required the police officers to obtain a search warrant.[13]

The more problematic issue is whether the police officers, having observed Lawson's conduct in open view, were authorized to seize Lawson's pipe and its contents without a warrant. Since Lawson had paid money to rent a booth from Velvet Video, had entered booth 7 in order to watch a video, and had closed and locked the door behind him, we conclude that it was reasonable for Lawson to expect that no one would enter booth 7 while he was in it without his permission. That is, because the pipe and its contents were not in a common or public space, the pipe and its contents were in a constitutionally protected area. Consequently, the police officers could not seize such evidence without a warrant unless probable cause and exigent circumstances existed for the seizure.

13. If there had been no glory hole in the wall adjoining booth 8, an illegal search would have been conducted if the officers, without prompting from Bowen, had viewed Lawson's smoking by climbing up and peering down into his booth from above.

In *Liebman v. State,* 652 S.W.2d 942 (Tex. Crim.App.1983), the Texas Court of Criminal Appeals held that two defendants who entered adjacent seven-foot-high "glory hole" booths with open tops, closed doors with locks, and no cracks to peer into the booths had a subjective expectation of privacy that was objectively reasonable. Therefore, the court concluded that police officers conducted an unlawful search when they stood on each other's cupped hands, took turns looking over the open tops of the booths, and observed conduct that led to the public lewdness charges against the defendants. *Id.* at 948.

Based on our review of the record, we conclude that the police officers had probable cause to arrest Lawson after they viewed him smoking a glass pipe. We also conclude that "exigent circumstances" existed that "demand[ed] immediate police response" and justified a warrantless seizure of Lawson's pipe and its contents. As the circuit court noted, Lawson was "lawfully observed in the act of ingesting an illegal drug and any delay would allow, more, if not all, of the drugs to be consumed." Moreover, Lawson had only rented the booth for a half hour and would likely have finished his business at Velvet Video long before the police could obtain a warrant from a judge. The police officers' warrantless seizure of the evidence that led to Lawson's arrest was thus constitutionally valid, and the circuit court correctly denied Lawson's motion to suppress.

## CONCLUSION

In light of the foregoing discussion, the October 3, 2001 Judgment, convicting Lawson of Promoting a Dangerous Drug in the Third Degree and Unlawful Use of Drug Paraphernalia, is affirmed.