113 P.3d 190

**JANRA ENTERPRISES, INC., dba Suzie's Adult Superstore, Plaintiff–Appellant**

v.

**CITY AND COUNTY OF HONOLULU, Defendant–Appellee.**

**No. 25814.**

Supreme Court of Hawai'i.

June 6, 2005.

Earle A. Partington, Honolulu, and Karen A. Essene, on the briefs, for plaintiff-appellant.

Jon M. Van Dyke, on the briefs, for defendant-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

We hold that Article 39, Revised Ordinances of Honolulu (ROH) §§ 41–39.1 through –39.12, and, more specifically, the provision therein requiring that the area of a booth designated for viewing pornographic videos purchased on the premises of a panoram business[1] be visible from the booth's entryway, (1) does not violate the right to privacy under article I, section 6 of the Hawai'i Constitution, as applied in *State v. Kam,* 69 Haw. 483, 748 P.2d 372 (1988), because a right to view adult material in an enclosed booth of a commercial establishment is not a necessary corollary to the established right to possess and view pornographic material in the home, and (2) does not infringe upon the right to free speech under article I, section 4 of the Hawai'i Constitution as applied in *State v. Bloss,* 64 Haw. 148, 637 P.2d 1117 (1981), inasmuch as (a) in seeking to curtail criminal activity associated with such booths, the ordinance is justified without reference to the protected material viewed within the booths and (b) by allowing panoram customers to continue to view the sexually explicit material in the booths as well as at home, the

---

1. *See infra* note 4.

ordinance leaves open alternative channels of communication.

Because the May 1, 2003 judgment of the first circuit court[2] (the court) entered in favor of Defendant–Appellee City and County of Honolulu (the City) and against Plaintiff–Appellant Janra Enterprises, Inc., dba Suzie's Adult Superstore (Appellant) is consistent with the foregoing propositions, we affirm the said judgment.

## I.

On September 29, 1999, Appellant filed a complaint to declare Article 39 unconstitutional and to enjoin its enforcement on grounds that it violates the rights to freedom of privacy and speech as set forth in the Hawai'i Constitution, article I, sections 4 and 6, respectively.[3]

Article 39 was enacted on April 30, 1997 as Ordinance 97–11 and became effective on January 1, 1998. On October 1, 1999, the parties stipulated to a temporary restraining order enjoining the City from enforcing Article 39 for six months. On June 22, 2001, the parties entered into a "Stipulation of Facts" (stipulation) in lieu of a trial. The following factual background is based upon this stipulation as well as the uncontested findings of fact by the court.

Appellant, a California corporation, owns and operates a business known as Suzie's (Suzie's) which rents and sells adult videotapes and operates an arcade consisting of twelve panoram[4] booths. There are two entrances to Suzie's, one by the front door on Kalākaua and the other through a rear door opening into a parking lot. Suzie's employees are generally in the front of the store and monitor the rear entrance via a closed-circuit television camera. Suzie's has twelve booths; eleven contain a monitor showing sexually explicit materials when money is deposited into a slot for a certain time period. The twelfth booth allows clients to view videos rented or bought from the store. Each booth can be completely enclosed by shutting a door, thereby ensuring complete privacy. Suzie's employees strictly enforce its policy of restricting the booths to one person at a time. In addition, Suzie's employs a security guard from 9:00 p.m. to 5:00 a.m. each day to enforce its policies and monitor Suzie's premises to ensure no unlawful activity occurs on the premises. Neither the Honolulu Police Department (HPD) nor other city agencies have received complaints about Suzie's or its booths in the twenty years it has been in Waikīkī.

Article 39 was introduced as Bill 89 in 1995. The City Council enacted Article 39 to address a perceived problem with drug dealing and prostitution in the use of panoram booths. The HPD or other City agencies received complaints concerning panoram businesses in other parts of Honolulu, but not specifically concerning activity in any booths at Suzie's or on its premises. During the City Council's Budget Committee's consideration of the bill on January 16, 1997, Councilmember Yoshimura stated that he had received complaints about "criminal activity" occurring in panoram booths, "includ-

2. The Honorable Gray W.B. Chang presided.

3. Article I, section 6 of the Hawai'i Constitution provides as follows:
   The right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest. The legislature shall take affirmative steps to implement this right.
   Article I, section 4 of the Hawai'i Constitution provides as follows:
   No law shall be enacted respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press or the right of the people peaceably to assemble and to petition the government for a redress of grievances.

4. ROH § 41–39.1 (1990) defines "panoram" as
   a device, installed or placed in a booth, which shows a person inside the booth a film or videotape depicting sexual conduct, sexual excitement, [or] sadomasochistic abuse, or sexual anatomical display, [which] means the display, with less than completely opaque covering of the human genitals, pubic area, or buttock or the female breast from below the top of the areola.
   A "panoram business" is defined as
   a business under which at least one panoram in a booth is made available for viewing by a patron in return for a fee or other consideration charged for activating the panoram, entering the booth, or accessing or remaining on the premises containing the booth.
   *Id.*

ing drug dealing and prostitution." In his view, the bill deterred such activities by providing entrance into the booths from a continuous main aisle and allowing an unobstructed line of sight into the booths.[5]

On January 29, 1997, an HPD officer submitted written testimony at the bill's public hearing that downtown panoram businesses have locked doors, which encourage illegal activities. According to the officer, individuals leaving the booths were arrested after exiting with "drug paraphernalia." In addition, the officer related that prostitutes reported the booths were frequently used "to perform their 'tricks.'" The officer maintained that the bill would "greatly reduce the use of panoram booths for illegal activity without impacting the intended legal purpose of video viewing." Subsequent to this testimony, the bill passed second reading.

The City Council's Budget Committee discussed the bill again on March 19, 1997. Councilmember Yoshimura explained that attorneys at the prosecutor's office had suggested the bill because drug dealing and prostitution was occurring in the booths. The HPD officer, who submitted written testimony at the January 29, 1997 hearing, submitted the same testimony at the March 19, 1997 hearing. Following the hearing, the Budget Committee passed the bill in Committee Draft 2 form. The January 16, 1997 report of the Budget Committee stated that the "purpose of [Article 39] is to impose restrictions on the panoram business as a means to curtail reported illicit activities taking place within the booths." On April 16, 1997, the City Council passed the bill and on April 30, 1997, the bill was signed into law.

Appellant's application for a panoram business license[6] was denied because Suzie's agents could not aver that Suzie's complied with all of the licensure requirements in Article 39. Specifically, Suzie's did not comply with § 41–39.8(b),[7] which requires a pano-

ram's viewing area to be visible and unobstructed. The viewing area of each panoram booth is not visible from the main aisle because it is completely blocked by a door.

If the owners of Suzie's were called to testify, they would have testified as follows:

Suzie's clientele use the panoram booths precisely because a fully enclosed booth provides complete privacy, and that, if the doors were removed, Suzie's would lose virtually all of its panoram clientele. Their customers want complete privacy in which to view the sexually explicit material available in the booths. Their customers do not wish other people to see the type of adult films they are watching because they do not wish to be labeled by virtue of the type of adult films (e.g., homosexual) they enjoy watching. If Suzie's were required to remove the doors from its panoram booths, it would be very difficult for Suzie's staff to ensure that only one person at a time be permitted in each booth.

On March 1, 2002, the court issued its findings of fact, conclusions of law, decision and order based on the stipulation, the parties' memoranda, and oral argument. The court ruled in favor of the City and denied Appellant's request for declaratory and injunctive relief, concluding, *inter alia,* that Appellant "is not likely to prevail on the merits, that the balance of irreparable damage does not favor the issuance of an injunction, and that the public interest does not support granting injunctive relief." The court found, in pertinent part, as follows:

13. Even if the one-person-per-booth rule were to be enforced rigorously by the owner of a panoram establishment, such enforcement will not necessarily fulfill the City's goals with respect to restricting drug abuses in the panoram booths, because *drug abuse can still occur with only one individual in a booth.*

The viewing area in each panoram booth must be visible from a continuous main aisle and must not be obscured by any curtain, door, wall or other enclosure at the entrance to the panoram booth.

---

5. *See infra* note 7.

6. Article 39 applies only to businesses displaying pornographic videos as defined in ROH § 41–39.1. *See supra* note 4.

7. ROH § 41–39.8(b) (1990) provides, in pertinent part, as follows:

14. The parties stipulated for purposes of this litigation that the sexually explicit materials sold, rented, and viewed at Suzie's are presumed to receive protection pursuant to the First Amendment of the United States Constitution and [a]rticle I, [s]ection 4 of the Hawai'i Constitution.

15. By a stipulation filed June 22, 2001, the parties agreed to merge the hearing on the preliminary injunction with the trial on the merits, and thus agreed that the Court's decision at this state of the litigation will be dispositive of the trial on the merits of the dispute.

(Emphasis added.) The court also concluded, in relevant part, as follows:

3. The First Amendment of the United States Constitution and [a]rticle I, [s]ection 4 of the Hawai'i Constitution allow governments to regulate the manner in which views are presented so long as (a) the regulation is not based on the content of the expression, (b) the regulation is substantially related to achieving a significant governmental interest, and (c) the regulation leaves open ample alternative channels of communication. *See, e.g., Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

4. The City of Honolulu's Article 39 is consistent with these requirements. Article 39 is a content-neutral regulation designed to achieve the important goal of regulating the illegal secondary impacts of the adult entertainment that is available in the enclosed panoram booths in a place of public accommodation. These secondary impacts include illegal drug abuse and prostitution, and Article 39 is substantially related to achieving these interests because the removal of doors from the panoram booths will make it easier to enforce laws prohibiting drug abuse and prostitution. *Article 39 is not aimed at censoring the sexual content of the video movies displayed in the panoram booths. Article 39 leaves open ample alternative channels of communication, because the movies can continue to be shown in the panoram booths after the doors are removed therefrom, and they are also available for purchase to be viewed elsewhere.* Article 39 is thus constitutional under both the First Amendment of the U.S. Constitution and [a]rticle I, [s]ection 4 of the Hawai'i Constitution.

. . . .

6. *But no decision under either the U.S. or the Hawai'i Constitution provides any support for Plaintiff's claim that its customers have a right to privacy to view sexually-explicit video movies in an enclosed panoram booth in a place of public accommodation.* The decision in *Kam,* supra, does not provide support for Plaintiff's claim on behalf of its customers because, unlike *Kam,* the present case does not involve any infringement of a customer's right to view such adult material in the privacy of the customer's home.

(Emphases added.) On September 26, 2002, the court granted Appellant's motion for an injunction during the pendency of this appeal and entered its judgment on May 1, 2003. Appellant filed its notice of appeal on May 9, 2003.

As mentioned, ROH § 41–39.8 requires panoram business license applicants to ensure that the viewing area in each panoram booth is visible from a continuous main aisle and not obscured by any curtain, door, wall or other enclosure at the booth's entrance. *See supra* note 7. On appeal, Appellant contends that this open-entry policy violates (1) the right to freedom of expression in article 1, section 4 of the Hawai'i Constitution and (2) the right to privacy in article 1, section 6 of the Hawai'i Constitution. Thus Appellant challenges the ordinance on state constitutional grounds only.

II.

As to the right of privacy, Appellant argues that the court erred (1) in holding that Article 39 does not violate the right of privacy in article I, section 6 of the Hawai'i Constitution as construed by *Kam,* (2) in ruling that Article 39 does not violate the Hawai'i constitutional right to free speech in article I, section 4, and (3) in denying a permanent injunction to enjoin the City from enforcing Article 39. Appellant requests this court to vacate the court's judgment and remand with

instructions to declare Article 39 unconstitutional and enjoin its enforcement.

In response, the City contends that (1) this court's interpretation and application of article I, section 4 of the Hawai'i Constitution has been consistent with federal court interpretations and application of the First Amendment, (2) courts across the country have uniformly rejected claims asserting that open-booth requirements violate rights of free expression, (3) the open-booth requirement in ROH § 41–39.8(b) is not "content-based" because it is designed to address secondary effects unrelated to expression and even if it were viewed as content-based, the intermediate level of scrutiny[8] applicable to time-place-manner regulations would still apply and the ordinance meets that level of scrutiny, (4) courts have uniformly rejected claims asserting that open-booth requirements violate rights of privacy, (5) ROH § 41–39.8(b) is not inconsistent with the right of privacy recognized in article I, section 6 of the Hawai'i Constitution, and (6) the economic impact of the City's panoram ordinance is not relevant to the analysis of its constitutionality.

### III.

■ Conclusions of law are analyzed under the right/wrong standard. *Gump v. Wal–Mart Stores, Inc.*, 93 Hawai'i 417, 420, 5 P.3d 407, 410 (2000). Questions of constitutional law are also reviewed *de novo* under the right/wrong standard. *Bank of Hawai'i v. Kunimoto*, 91 Hawai'i 372, 387, 984 P.2d 1198, 1213 (1999). "Under the right/wrong standard, this court examines the facts and answers the question without being required to give any weight to the trial court's answer to it." *Leslie v. Estate of Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999) (internal brackets and quotation marks omitted). Additionally, where the evidence is uncontradicted, this court will consider issues on which the trial court did not make specific findings. *Fong v. Hashimoto*, 92 Hawai'i 637, 645 n. 9, 994 P.2d 569, 577 n. 9 (App.

1998), *vacated on other grounds*, 92 Hawai'i 568, 994 P.2d 500 (2000) (citing *Molokoa Vill. Dev. Co. v. Kauai Elec. Co.*, 60 Haw. 582, 593; 593 P.2d 375, 382 (1979)).

### IV.

As to Appellant's argument that the court "erred in holding that this case is not controlled by *Kam* and the Hawai'i constitutional right to privacy," Appellant contends (1) "the right to privacy in Hawaii protects the right to purchase pornographic materials," (2) *Kam* "is not an aberration, but is part of a trend toward recognizing that state constitutional rights protect the purchase and viewing of sexually explicit materials[,]" (3) "purchaser-viewers of sexually explicit videos are essentially similar to the purchaser-viewers of pornographic materials in *Kam* [,]" and (4) "[t]he City wants to impose a *de facto* ban on panoram booths, but under strict scrutiny it must choose a less restrictive alternative instead."

■ The City responds that (1) courts in other jurisdictions have consistently held open-booth requirements do not violate constitutional rights of privacy and (2) ROH § 41–39.8(b) is not inconsistent with the right of privacy recognized in this jurisdiction inasmuch as (a) *Kam* is the only Hawaii decision that "modest[ly]" departs from federal precedents and is designed only to address a paradox in such precedent, (b) "Hawai'i case law does not support Appellant's claim that the right to privacy includes the right to view sexually explicit materials in enclosed booths in places of public accommodation," and (c) "even if a privacy interest is implicated by [the] panoram ordinance, the City has a compelling interest to justify the ordinance and has utilized the least drastic alternative." We conclude that the Hawai'i constitutional right to privacy under article I, section 6 does not encompass the right to view adult

---

8. Under intermediate scrutiny, a time, place, or manner restriction "will be upheld if it is designed to serve a substantial government interest, is narrowly tailored to serve that interest, and does not unreasonably limit alternative avenues

of communication." *Ctr. for Fair Pub. Policy v. Maricopa County*, 336 F.3d 1153, 1166 (9th Cir. 2003) (citing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)).

material in an enclosed booth within a commercial establishment.[9]

## A.

In apparent reference to his first contention, Appellant maintains that *Kam* "held that the right to privacy under [a]rticle I, [section] 6[ ] of the Hawai'i Constitution encompasses not only the right to own pornographic materials but also the correlative right to purchase such materials for one's personal use." In *Kam*, this court reversed the appellants's convictions under a statute criminalizing promotion of pornographic adult magazines on the ground that the statute infringed on the right to privacy under the Hawai'i Constitution. 69 Haw. at 484–85, 748 P.2d at 373–74.

The *Kam* opinion began by explaining the United States Supreme Court precedent construing the right to privacy under the federal constitution. It observed that under *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), states may not "prohibit an individual from possessing and viewing ... pornographic materials in the privacy of his or her own home." 69 Haw. at 489–90, 748 P.2d at 376. It also acknowledged that the Supreme Court had "effectively ruled 'that the protected right to possess obscene material in the privacy of one's home does not give rise to a correlative right to have someone sell or give it to others.'" *Id.* at 490, 748 P.2d at 376 (quoting *United States v. 12 200-Ft. Reels of Super 8mm Film*, 413 U.S. 123, 128, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973)). Hence, the *Kam* court was confronted with the "paradoxical conflict" inherent in the Supreme Court cases, *id.*, which recognized the right to possess and view pornographic material, but not the right to sell the material or give it to others.

Following a discussion of Supreme Court case law premised on the first amendment, this court noted that the "Hawaii Constitu-

tion article I, section 6, ... afford[ed] much greater privacy rights than the federal right to privacy, so [it] was not bound by the United States Supreme Court precedents." *Id.* at 491, 748 P.2d at 377. Acknowledging that it was obligated to construe the Hawai'i Constitution "with due regard to the intent of the framers and the people adopting it[,]" *id.* at 492, 748 P.2d at 377, this court examined the reports of the 1978 Constitutional Convention. This review led the *Kam* court to conclude that the privacy concept protected by the Hawai'i Constitution encompasses "certain highly personal and intimate affairs of a person's life." *Id.* at 493, 748 P.2d at 378 (brackets omitted). Accordingly, it held that the "personal decision ... to read or view pornographic material in the privacy of one's own home must be afforded the protection of the Hawaii Constitution article I, section 6 from government interference." *Id.* at 493, 748 P.2d at 378–79. It was reasoned that "[s]ince a person has the right to view pornographic items at home, there necessarily follows a correlative right to purchase such materials for *this* personal use, or the underlying privacy right becomes meaningless." *Id.* at 495, 748 P.2d at 380 (emphasis added).[10]

That the rights to sell and purchase pornographic material recognized in *Kam* were termed "correlative" is significant. The rights to sell and purchase are an extension of the *Stanley* right to possess and view pornographic material in the home. *Cf. State v. Mallan*, 86 Hawai'i 440, 445, 950 P.2d 178, 183 (1998) ("[E]ven though the material may be purchased outside the home, it still must be purchased for personal use within the home."). Thus, Appellant's interpretation of the *Kam* holding is incorrect. *Kam* stands for the proposition that under the facts of that case, the Hawai'i right to privacy encompasses the correlative right to purchase pornographic material as it was used in the

9. Appellant's framing of the issue asks whether "the right to view adult materials in the privacy of a panoram booth falls within the ambit of *Kam* and the right-to-privacy provision of the Hawaii Constitution."

10. Quoting from Justice Stevens's dissent in *Pope v. Illinois*, 481 U.S. 497, 518, 107 S.Ct. 1918, 95

L.Ed.2d 439 (1987) (Stevens, J., dissenting, joined by Marshall, J., and Brennan, J., in part), the *Kam* court observed that " 'it insults the citizenry by declaring its right to read and possess material which it may not legally obtain.' " 69 Haw. at 491, 748 P.2d at 377.

home, and not, as Appellant too broadly suggests, "in a private place of [one's] own choosing." [11]

### B.

We are not persuaded by Appellant's second contention, which maintains that *Kam* is a "trend toward recognizing that state constitutional rights protect the purchase and viewing of sexually explicit materials." The cases cited by Appellant, *State v. Henry*, 302 Or. 510, 732 P.2d 9 (1987), and *Pap's A.M. v. Erie*, 571 Pa. 375, 812 A.2d 591 (2002) [hereinafter *Pap's III*], were not decided under state constitutional protections of privacy, but of free speech. Hence, they do not aid in advancing Appellant's position with respect to the privacy right under article I, section 6 of the Hawai'i Constitution.

### C.

In its third contention, Appellant declares that "what mattered to the *Kam* court was not the home *per se*, [but] the home as a place of privacy appropriate to the particular medium" and that here, where the "medium" is adult *videos*, as opposed to magazines, the panoram booth is the appropriate "place of privacy." But, as stated *supra*, this reading

of *Kam* is overly broad. The *Kam* rationale for recognizing the correlative rights to sell and purchase adult material was that, without these concomitant rights, the already established right to possess and view adult material would be "meaningless." 69 Haw. at 495, 748 P.2d at 380. In contrast, a purported right to view adult material in panoram booths is not necessary to give effect or "meaning" to the right to possess and view adult material. Furthermore, panoram booths are located in commercial establishments and, hence, any regulation of the booths does not impact a person's right to possess and view adult material in a home.[12]

Accepting Appellant's suggestion that the privacy right depends upon the particular medium of adult material would extend article I, section 6 protection to any place where a person encloses him or herself, allowing the person to create, in Appellant's words, his or her own "place[s] of privacy." There is nothing in the history of article I, section 6 that would appear to extend such privacy protection, however, in a commercial establishment open to the public.[13] *Cf. Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 66, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (observing that the United States Supreme Court has "declined to equate the privacy of the home relied on in

---

11. While one's choice of a particular place claimed to be deserving of privacy does not necessarily insulate it under our constitution's privacy clause, *Kam* would reasonably extend to those places, like a home, objectively recognized as dwelling places.

12. Appellant argues that "[m]any of Suzie's patrons ... would not buy videos that could not be previewed, and would not view other videos without clear assurances of privacy in the panoram booths." However, according to the stipulated facts, Suzie's provides a single booth that allows a customer to view a videotape *"purchased* or *rented* at a set price from the store."* (Emphases added.) Previewing *prior to sale or purchase* was not stipulated to as fact. Appellant's vice president and general manager stated in a declaration that "[p]atrons at Suzie's often view film or videotape and later purchase the film or videotape viewed." He did not say, however, that without the preview option, customers would not purchase the videotapes. Even if the contention were established, we are not convinced that the right to privacy should encompass a right to preview sexually explicit materials prior to purchase in an enclosed booth on commercial premises as discussed above.

13. In *Kam*, this court looked to the report of the 1978 Constitutional Convention's Committee on Bill of Rights, Suffrage and Elections, which stated, in part, as to the right of privacy, as follows:

> It gives each and every individual the right to control certain highly personal and intimate affairs of his own life. The right to personal autonomy, to dictate his lifestyle, to be oneself are included in this concept of privacy. As Justice Abe stated in his concurring opinion in *State v. Kantner*, 53 Haw. 3[71], 493 P.2d 306 (1972): each person has the "fundamental right of liberty to make a fool of himself as long as his act does not endanger others, and that the state may regulate the conduct of a person under pain of criminal punishment only when his actions affect the general welfare that is, where others are harmed or likely to be harmed."

69 Haw. at 492, 748 P.2d at 378 (quoting Stand. Comm. Rep. No. 69, in 1 Proceedings of the Constitutional Convention of Hawaii of 1978, at 674–75 (1980) (emphasis added)).

*Stanley* with a 'zone' of 'privacy' that follows a distributor or a consumer of obscene materials wherever he goes"). As we note herein, panoram booth users are still able to view the adult material in the booths, inasmuch as Article 39 does not preclude the viewing, selling, or purchasing of the material found at panoram businesses, but requires only that the viewing area in the booths "not be obscured by any curtain, door, wall or other enclosure at the entrance[s]." ROH § 41–39.8.

### D.

Appellant does not provide a basis for protecting the viewing of adult material in an enclosed panoram booth independent of *Kam*, but maintains, throughout its briefs, that *Kam* is dispositive.[14] Inasmuch as Appellant does not explain how viewing adult material in an enclosed panoram booth would otherwise fall within the perimeters of article I, section 6 protection, *i.e.*, how it constitutes a "certain highly personal and intimate affair[ ] of [a person's] life," [15] *Kam*, 69 Haw. at 493, 748 P.2d at 378, *cf. Paris Adult Theatre I*, 413 U.S. at 66, 93 S.Ct. 2628 ("Nothing . . . in this Court's decisions intimates that there is any 'fundamental' privacy right 'implicit in the concept of ordered liberty' to watch ob-

scene movies in places of public accommodation."), we must decline to broaden the correlative rights under *Kam*. Accordingly, we hold that viewing adult material in an enclosed panoram booth on commercial premises is not protected by the fundamental right of privacy enshrined in article I, section 6 of the Hawai'i Constitution. In light of our holding, we need not consider the issue of whether the City must choose the least drastic alternative under strict scrutiny as proposed in Appellant's fourth contention.

### V.

■ Appellant argues that Article 39 violates the free speech clause of article I, section 4 of the Hawai'i Constitution because (1) pursuant to *Bloss*, 64 Haw. 148, 637 P.2d 1117, Article 39 "fails to leave ample practical viewing alternatives for many viewers, making the ordinance a *de facto* ban on panoram booths[,]" (2) Article 39 "is plainly content based, and the City's continued recitation of legal fictions premised on 'secondary effects' will not alter that basic fact[,]" and (3) "[t]his court should follow the lead of the Supreme Court of Pennsylvania in its honest and forthright analysis of free speech issues" in *Pap's III*, in lieu of the "discredited legal

**14.** Appellant argues that an Intermediate Court of Appeals case, *State v. Lawson*, 103 Hawai'i 11, 78 P.3d 1159 (App.2003), "recognized by clear implication that there is a reasonable expectation of privacy in an enclosed panoram booth." *Lawson*, however, involved privacy in the criminal search and seizure context under article I, section 7, which involves a distinct and separate constitutional analysis apart from that of article I, section 6. *See State v. Augafa*, 92 Hawai'i 454, 463 n. 10, 992 P.2d 723, 732 n. 10 (App.1999) (distinguishing between privacy as "a fundamental right" under article I, section 6 and privacy as "a test of . . . the prohibition against unreasonable searches and seizures" under article I, section 7).

**15.** Appellant asserts that "adult videos are among those 'highly intimate and personal affairs' for which one expects privacy." Additionally, in a footnote, it posits that

> [f]or a significant portion of Suzie's clientele, *those highly personal and intimate affairs include the viewing of adult videos*, which may offer a chance to vicariously explore sexual fantasies or play out sexual preferences, or may satisfy a curiosity about various sexual

practices, or the like. Moreover, Suzie's gay customers frequently consider that privacy is a necessity not just in the ordinary sense, but also for personal safety reasons, as pointed out by Janra's counsel before the circuit court, in view of national press reports of periodic, vicious homophobic attacks on gay men.

(Emphasis added.) Pursuant to *Stanley* and *Kam*, Appellant is correct in its observation that "the viewing of adult videos" is protected under article I, section 6. But the question here is not whether viewing is a protected right, but whether viewing in a panoram booth at a commercial establishment falls within such protection.

We are not unmindful of Appellant's concerns regarding "a significant portion of Suzie's clientele" and "gay customers." However, these assertions are not facts that were stipulated to, nor are there facts in the record from which the assertions can be verified reasonably. We do note, moreover, as stipulated to, Appellant enforces measures to insure solitude and isolation. It was stipulated that employees are located near the front of the door, employees monitor a back door, each of the booths has a separate entrance, use of a booth is restricted to one person at a time, and a security guard is on the premises from 9 p.m. to 5 a.m. *See* discussion in Part I.

fiction [among the federal jurisdictions] that content-based laws are 'content neutral.' "

The City responds that (1) "ample alternative channels certainly exist for sexually-explicit films and videotapes, including the very same booths themselves—because the booths can still be used for viewing even when their doors are removed[,]" (2) the open-booth requirement is not content based, but designed to address "secondary effects" unrelated to expression, and even if viewed as content based, Article 39 constitutes a valid "classic 'manner' regulation governed by the 'time-place-manner' standard" in *Bloss*, and (3) this court should follow federal jurisdictions that have "uniformly . . . rejected" the claim that open-booth requirements violate freedom of expression inasmuch as this court's application of article I, section 4 has been consistent with federal court application of the First Amendment.

Preliminarily, we note that the parties stipulated that "[f]or purposes of this litigation, the sexually explicit materials sold, rented, and viewed at Suzie's are presumed to receive protection to the First Amendment of the United States Constitution and [a]rticle I, [section] 4, of the Hawaii Constitution." We observe, however, that Appellant challenges Article 39 solely on state constitutional grounds.

## VI.

Appellant maintains that *Bloss*, a commercial speech case, is controlling. In *Bloss*, this court addressed the constitutionality of an ordinance that made it "unlawful for any person . . . to distribute commercial handbills, or to carry on or conduct any commercial promotional scheme, advertising program or similar activity" in designated areas, including Waikiki.[16] 64 Haw. at 149, 637 P.2d at 1119–20. The United States Supreme Court's four-part test for determining the validity of government restrictions on commercial speech as developed in *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) was adopted.[17] In applying the fourth prong of the *Central Hudson* test—whether "the regulation [is] more extensive than necessary to serve the asserted governmental interest[,]" 64 Haw. at 160, 637 P.2d at 1126,—this court inquired whether the handbilling ordinance presented a "reasonable time, place and manner restriction," *id.*, and adopted the Supreme Court's three-part test in *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

Under *Bloss/Virginia Pharmacy*, time, place, and manner restrictions are constitutionally permissible if they (1) are "justified without reference to the content of the regulated speech," (2) "serve a significant governmental interest," and (3) "leave open ample alternative channels for communication of the information." [18] *Id.* at 160–61, 637 P.2d at 1127 (quoting *Virginia Pharmacy*, 425 U.S. at 771, 96 S.Ct. 1817). This court began by noting that the handbilling ordinance could not be considered a proper regulation as to time or manner because it "prohibit[ed] commercial speech at all time and in any manner in Waikiki." *Id.* at 161, 637 P.2d at 1127. It was also determined that the ordinance was "not a permissible place regulation" because there was "nothing in the record showing the incompatibility of commercial handbilling with activities in Waikiki." *Id.* Apparently

16. *Bloss* concerned commercial speech. It established an analytical framework for assessing speech that "is given lesser protection than other forms of expression." 64 Haw. at 157, 637 P.2d at 1125.

17. As indicated in *Bloss*, the *Central Hudson* test inquires whether (1) "the expression is protected by the First Amendment[,]" (2) "the asserted governmental interest is substantial[,]" (3) "the regulation directly advances the governmental interest asserted[,]" and (4) "[the regulation] is not more extensive than is necessary to serve the interest." 64 Haw. at 158, 637 P.2d at 1125 (quoting *Central Hudson*, 447 U.S. at 566, 100 S.Ct. 2343).

18. It should be noted that the court in this case did not cite to *Bloss*, but to the United State Supreme Court's decision in *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). However, the court's citation to *Ward* is not conflicting inasmuch as the *Ward* test for time, place, or manner restrictions is identical to the *Bloss* test.

referring to the first element of the *Virginia Pharmacy* test, this court then stated that

> [i]n addition, time, place and manner restrictions must be content neutral, and must apply to all forms of speech. *By banning all commercial handbilling in Waikiki, the ordinance singles out speech of a particular content and seeks to prevent its dissemination completely.* Thus, this regulation cannot be considered content neutral. The instant ordinance permits noncommercial forms of speech and handbilling while completely banning commercial handbilling in Waikiki.

*Id.* (emphasis added) (citations omitted). Finally, with respect to the third element of the *Virginia Pharmacy* test, the *Bloss* court held that the total ban on commercial handbills did "not leave open ample alternative channels of communication" because the alternatives proffered by the State—advertising through newspapers, radio, key rings, ballpoint pens, or tourist publications—would "involve *greater expense* and may be *a less effective means* for communicating messages." *Id.* at 161–62, 637 P.2d at 1127–28 (emphases added). It was reasoned that "[a]lthough preventing public nuisances to enhance the attractiveness of tourism is important, *on balance, this rationale is not sufficient to justify the total suppression of commercial speech, which disseminates information that is neither false, misleading nor related to illegal activity.*" *Id.* at 162, 637 P.2d at 1128 (emphasis added). Consequently, this court recognized that speech may be regulated when, "on balance," government's interest "justif[ies]" the regulation. *Id.*

## VII.

### A.

Appellant's arguments are related to the first and third elements of the *Bloss* test for time, place, and manner restrictions. As to the first element, whether the restriction is "justified without reference to the content of the regulated speech," we answer in the affirmative. In *Bloss*, this court determined that the handbilling ordinance could not "be considered content neutral" because it "single[d] out speech of a particular content and [sought] to prevent its dissemination completely." *Id.* at 161, 637 P.2d at 1127. In other words, the *complete ban* of *commercial* handbilling evinced government's disapproval of the *content* of the speech itself—precisely what the free speech guarantee protects against. Accordingly, this court could not deem the handbilling ordinance in *Bloss* to be "justified without reference to the content of the regulated speech." *Id.* at 160, 637 P.2d at 1127.

In contrast, Article 39 does not effectuate a total ban on panoram booths or the sexually explicit material therein and it does not interfere with the way the material is transmitted to panoram viewers. *Bloss* also held that the government's interest in preventing nuisances to enhance the attractiveness of tourism, "on balance," was "not sufficient to justify the total suppression of commercial speech, which disseminate[d] information that [was] neither false, misleading, *nor related to illegal activity.*" *Id.* at 162, 637 P.2d at 1128. Unlike the commercial handbilling at issue in *Bloss*, the panoram booths here have been found to be "related to illegal activity."

The City enacted Article 39 to reduce the "illegal activity" "related" to panoram booths—"drug dealing and acts of prostitution." The City Council determined that enclosed panoram booths, while providing a means to view sexually explicit material, also harbored prostitution and illegal drug activity. Removing the doors from the booths can, as the court found, "make it easier to enforce laws prohibiting drug abuse and prostitution" without affecting the films being shown.[19] Article 39 does not prohibit the

---

19. The court found that "drug abuse can still occur with only one individual in a booth." But, Appellant argues that "[w]hen Article 39 was enacted, the City's concern was 'drug *dealing*' in panoram booths. In the circuit court's findings, however, a new concern—'drug abuse [by an] individual in a booth'—appeared the first time.

The circuit court's finding is clearly erroneous, as it is without evidentiary support in the record." (Emphasis and brackets in original.) (Citation omitted.)

· However, the court's finding is supported by police testimony that "[o]fficers on routine inspections have made drug arrests after witness-

viewing, selling, purchasing, or renting of material found at panoram establishments. Thus, Article 39, in contrast to the handbilling ordinance in *Bloss*, does not "single[ ] out" sexually explicit material shown at panoram booths and does not "seek[ ] to prevent its dissemination completely." *Id.* at 161, 637 P.2d at 1127. Inasmuch, then, as Article 39 does not altogether ban panoram booths and is, instead, designed to reduce the illegal activity associated with the booths, we hold that Article 39 is justified without reference to the sexually explicit material viewed in panoram booths, satisfying the first element of the *Bloss* test.

## B.

### 1.

As to the third element of the *Bloss* test, we concur in the court's conclusion no. 4 that "Article 39 leaves open ample alternative channels of communication because the movies can continue to be shown in the panoram booths after the doors are removed therefrom, and they are also available for purchase to be viewed elsewhere." Appellant argues that "Article 39 fails to leave ample practical viewing alternatives for many viewers[.]" It maintains that "this court held that the ordinance must not be 'more extensive than necessary to serve the asserted governmental interest' and that any such ordinance must 'leave open ample alternative channels of communication,' not just in theory, but in practice."

In maintaining that there are no ample alternative channels of communication, Appellant asserts (1) that "[m]any of Suzie's patrons would be so uncomfortable in an open-booth, no closed-doors atmosphere that they simply would not return," (2) that for tourists, many from Japan, viewing elsewhere may be an impossibility, (3) that for Oahu residents, viewing at home may be a practical impossibility if they lack suitable videotape players or if children live at the viewer's home, (4) that patrons would not buy videos that could not be previewed and would not view other videos without clear assurances of privacy in the booths, an argument made also with respect to the privacy claim, *see supra* note 12, (5) that for "gay customers" in particular, "non-private viewing is dangerously impractical" because these members of the community depend upon the privacy afforded by closed booths for "personal security reasons," another argument repeated with respect to its privacy claim, *see supra* note 15, and (6) that "[a] real potential exists that Suzie's may be forced out of business for lack of its patrons[ ] being assured of privacy in which to view the videos they wish." Appellant concludes that "[c]onsequently, the circuit court's impractical and more costly alternatives . . . do not pass constitutional muster."

### 2.

In *Bloss*, the State's proffered alternative channels of communication were rejected as being "far from satisfactory since they may involve greater expense and may be a less effective means for communicating messages." 64 Haw. at 162, 637 P.2d at 1128. We conclude that Appellants have failed to establish that the open-entry requirement involves greater expense and that the ordinance would diminish the "means for communicating [the] messages." *Id.*

Appellant's assertions (1), (4), and (5) that patrons would be concerned over who might see them viewing films would not increase the expense or reduce the effectiveness of disseminating the material. The panoram customers patronize a booth or booths "depicting sexual conduct, sexual excitement, [or] sadomasochistic abuse [as these terms are defined in HRS § 712–1210,] or sexual anatomical display," which "means the display, with less than completely opaque covering, of the human genitals, pubic area, or

ing individuals exiting these booths with drug paraphernalia." Moreover, throughout its consideration of Article 39, the City Council referred to broad objectives—"protect[ing] public health and safety" and "curtail[ing] criminal activity," such as "drug *use* and sale and prostitution." (Emphasis added.) And as noted previously, the

January 16, 1997 report of the Budget Committee, attached as Exhibit F to the stipulated facts, stated that the "purpose of [Article 39] is to . . . curtail reported *illicit activities* taking place within the booths." (Emphasis added.) Thus, the court's reference to "drug abuse" as opposed to "drug dealing" is not clearly erroneous.

buttock or the female breast from below the top of the areola." ROH § 41–39.1 (1990); *see supra* note 4. Hence, such an establishment by definition serves to satisfy such viewing. It is arguable that the attention, if any, associated with the patronage of these establishments attaches when a person enters the establishment, irrespective of the material viewed in the booth. *Cf. Movie & Video World, Inc. v. Bd. of County Comm'rs,* 723 F.Supp. 695, 700 (S.D.Fla.1989) (rejecting testimony of adult establishment owner that " 'some' of his customers told him that they would not pay to watch films in the booths if there were no doors on the video booths[,]" by observing that "anonymity is destroyed even before the patron enter[s] the building"). Therefore, we are not persuaded on this record that the open-entry requirement would cause panoram booth customers to be more "uncomfortable" or subject to greater "anxiety," assuming that such factors are determinative.[20]

With respect to assertion (2), there are no stipulated facts or stipulation as to testimony that tourists would be hindered or that "viewing [would be] an *impossibility* " (emphasis added) for them. As with other customers, tourists are not banned from watching the films, and compatible video players may be accessible in hotel rooms or otherwise. Assertion (3) that it "may be a practical *impossibility* " (emphasis added) for residents to look at the videos at home because children or other adults who do not wish to see the videos may be present, does not appear to be cogent. This argument is not persuasive because a viewer may separate him or herself from other members of the household by surveying the video alone or in another room.

■ Finally, as to assertion (6) that Article 39 may cause a decline in Appellant's business, we must note, as have other courts, that the right to free speech "is not concerned with economic impact; rather it looks

only to the effect of [an] ordinance upon freedom of expression." *Mitchell v. Comm'n on Adult Entm't,* 10 F.3d 123, 132 n. 10 (3d Cir.1993) (quoting *Young v. Am. Mini Theatres,* 427 U.S. 50, 78, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (Powell, J., concurring)). *See also Movie & Video World, Inc.,* 723 F.Supp. at 700 ("First Amendment does not guarantee anyone profit; all it requires is that speech, expression, and ideas be allowed a physically adequate forum."). Inasmuch as Article 39 does not preclude the viewing of sexually explicit material in panoram booths, the ordinance may be upheld despite any purported adverse economic effects upon panoram business owners. Ultimately, the ordinance does not ban viewing or affect the manner in which the film is displayed. *See Mitchell,* 10 F.3d at 144 (determining that an open-door requirement left "ample alternative channels of communication" because "[n]othing in it limit[ed] the number of viewing booths or the type of material that can be shown within the booths"). Therefore, we cannot say that Article 39 subjects panoram businesses or customers to greater expense or that it results in a less effective means for disseminating sexually explicit material.

### 3.

Additionally, we observe that it is unclear how Appellant's three proposed alternatives to the open-entry requirement—(1) enforcement of a one-person-per-booth rule, (2) installation of overhead ceiling mirrors, and (3) a partial-door requirement—would be more protective of a panoram customer's viewing, while simultaneously allowing the City to achieve its purpose of curtailing criminal activity. As to the first alternative, as Appellant states, it enforces the rule now, but such a rule is not an alternative that would permit observation of the customer's area and, hence, would not achieve the City's objective of curtailing drug activities.

---

**20.** As to assertions (4) and (5), we reiterate the analysis set forth in notes 12 and 15, respectively. As previously discussed in the privacy analysis, *see supra* note 12, Appellant's contention that customers "would not buy videos that could not be previewed" cannot be determined from the record. Likewise, Appellant's contention that "gay customers" need enclosed booths for "personal security reasons," was not stipulated to below, and cannot be attributed the status of "fact" for the purpose of our decision. We noted, also, that measures are taken by Appellant to protect its customers. *See supra* note 15.

Also, there is little difference between a ceiling mirror, Appellant's second alternative, a "partial door," Appellant's third alternative, and an opening, as prescribed in Article 39, inasmuch as all three alternatives enable one to examine the inner booth. The ordinance provides that "[t]he viewing area in each panoram booth must be visible from a continuous main aisle and must not be obscured by a curtain, door, wall or other enclosure at the entrance of the panoram booth." ROH § 41–39.8(b). Thus, Article 39 directs that the opening to the panoram booth be sufficient to reveal the viewing area.

## VIII.

Inasmuch as we have determined that the ordinance satisfies the *Bloss* test, we do not discuss Appellant's arguments relating to the doctrine of "secondary effects" [21] and the case of *Pap's III*, 571 Pa. 375, 812 A.2d 591.[22] In light of the discussion *supra*, we do not believe Appellant has established violations of the right to privacy or of speech under the Hawai'i Constitution. Accordingly, we need not address Appellant's arguments as to the court's denial of injunctive and declaratory relief.

**21.** We observe that the United States Supreme Court has "struggle[d] to articulate a [manageable] standard to govern" restrictions on erotic expression. *Pap's III*, 812 A.2d at 611. *See Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002); *Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *Renton*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29. The multiple opinions in these cases reflect the division among the Supreme Court justices on the *Renton* "secondary effects" doctrine, which we decline to address in assessing the free speech guarantee under the Hawai'i Constitution. We note, however, that the federal courts have upheld regulations similar to Article 39 under the secondary effects test. *See, e.g., Mitchell*, 10 F.3d at 141, 144 (upholding an open-door requirement as a valid content-neutral time, place, and manner regulation); *Banion Corp. v. Dayton*, 923 F.2d 470, 474 (6th Cir.1991) (upholding an ordinance prohibiting video booths to be obscured by curtain, door, or other enclosure as a valid time, place, and manner restriction). *See also Ctr. for Fair Public Policy*, 336 F.3d at 1159 (recognizing that six federal circuits have upheld hours of operation restrictions on sexually-oriented businesses under the secondary effects test).

## IX.

Based on the foregoing, the court's May 1, 2003 judgment is affirmed. However, in light of (1) the parties' stipulation to stay enforcement of the administrative rules adopted to implement Article 39 and (2) the court's September 27, 2002 order granting Appellant's motion for injunction during pendency of appeal, the case is remanded to the court for entry of an appropriate order in accordance with this opinion.

**22.** In *Pap's III*, the Pennsylvania Supreme Court held that the Pennsylvania Constitution provided greater protection than the first amendment and, therefore, a public indecency ordinance making it a summary offense to appear in public in a state of nudity failed under strict scrutiny. 812 A.2d at 593. The court concluded that "[i]t is hardly onerous to require that a regulation that would seek to govern such expression, offered in a closed establishment to consenting adult patrons, be accomplished by a narrower, less intrusive method *than the total ban on expression* adopted here." *Id.* at 612 (emphasis added).

The open-door requirement at issue in this case does not constitute a "total ban on expression." Thus, while mindful that we are "the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawaii Constitution," *Kam*, 69 Haw. at 491, 748 P.2d at 377, and that like the Pennsylvania Supreme Court, we have "not hesitated to render [an] independent judgment as a matter of distinct and enforceable [Hawai'i] constitutional law[,]" 812 A.2d at 607, we are not persuaded to follow the analysis of the Pennsylvania Court due to the factual dissimilarities between the present case and *Pap's III*.